UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Honorable Marcia S. Krieger

Criminal Action No. 06-cr-00294-MSK

UNITED STATES OF AMERICA,

       Plaintiff,

v.

1. WILLIAM C. CRABBE, and
2. JAMES S. ROWAN,

       Defendants.

---

## ORDER EXCLUDING OPINION TESTIMONY

---

**THIS MATTER** comes before the Court on the parties' joint motions (**#148, 149**) under

Fed. R. Evid. 702, asking the Court to determine the admissibility of opinions expressed by

Revenue Agent Jonathon Lynch.  The Court held evidentiary hearings on the motions on June 15

and October 25, 2007.[1]  Having considered the arguments of the parties and the evidence

presented at the hearings, the Court makes the following findings and conclusions.

### I.  Jurisdiction

This is a criminal case in which the Court exercises subject matter jurisdiction pursuant to

18 U.S.C. § 3231.   The Indictment (**#1**) charges that the Defendants violated 18 U.S.C § 2 and

26 U.S.C. §§ 7201, 7202, 7203, and 7206(1).   Specifically, it alleges that the Defendants, owners

---

[1]The parties were unable to complete presentation of evidence at the first hearing, therefore it was continued until July 27, 2007.  Before the continued hearing commenced, counsel for Defendant Rowan withdrew and new counsel was appointed.  To allow new counsel sufficient time to review discovery and prepare, the Rule 702 hearing was further continued until October 25, 2007.

of Columbine Health Care Systems, Inc. ("Columbine"), a national nurse-staffing agency that places nurses in short-term work assignments in thirty-seven states, failed to account for and pay employee federal income and Social Security taxes for several hundred of Columbine's nurses between 1999 and 2002. It further alleges that the Defendants filed false Form 941 tax returns for certain portions of said period. Finally, it charges the Defendants with tax evasion by failing to report and pay income taxes on income they earned in 2001.

## II. Analysis

### A. Issue Presented

The Government has offered eight opinions of Revenue Agent Lynch. As more fully set forth below, he opines that Columbine's tax returns and filings understated nurses' wages and withholdings made by Columbine from its employees' pay in specific amounts for specific financial quarters; that Columbine withheld from its employees' paychecks, but failed to pay over to the IRS, specified sums for Social Security, medicare, and income taxes; that Columbine failed to pay its own share of Social Security and medicare taxes in specific amounts for specific time periods; and that it underpaid employment taxes for all tax quarters of 1999 through 2002. In addition, Agent Lynch opines that Global Management, a partnership of the Defendants, was a "shell company," and that $400,000 paid by Global Management to each Defendant during 2001 was income rather than a loan. As a result, Agent Lynch opines that each Defendant has outstanding income tax liability for those payments.

The Defendants object to admission of these opinions at trial on the grounds that the opinions suffer from an inadequate foundation pursuant to F.R.E. 702. They challenge each opinion on four grounds: (i) that Agent Lynch lacks sufficient skill, training, knowledge and

2

experience to render the opinion; (ii) that Agent Lynch did not use reliable principles or methodologies in formulating the opinion; (iii) that Agent Lynch did not obtain sufficient facts and data; and (iv) that Agent Lynch did not reliably apply the principles or methodology to the facts and data.

## B.  General principles of Rule 702

The foundational requirements for admission of expert opinions are set forth in Fed. R. Evid. 702, which provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Adopted in response to *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579 (1993), Rule 702 was revised effective December 1, 2000.

The current Rule 702 departs from its predecessor by significant degree.  Under the older Rule 702, once a witness was qualified by knowledge, skill, experience, training, or education, he or she could express any opinion falling within the scope of his or her expertise.  Thus, to admit any expert opinion, it was only necessary to demonstrate that the witness had sufficient qualifications in the subject area.  This gave rise to the trial practice of counsel "offering" and the Court "receiving" a witness "as an expert in the field of _____."

Under the current version of Rule 702, a witness' qualifications are no longer sufficient foundation, in and of themselves, to admit expert testimony.  Now, in addition to the witness

having appropriate qualifications, the proponent of the witness' opinions must demonstrate that the process by which the witness derived his or her opinions is reliable. Rule 702 anticipates that, upon challenge, a factual foundation keyed to specific testimony will be offered by the proponent of the witness. In the Tenth Circuit, determination of the sufficiency of the foundation for admission of expert testimony requires factual findings, preferably after an evidentiary hearing. *Dodge v. Cotter Corp.*, 328 F.3d 1212, 1222 (10th Cir. 2003).

As set forth in this Court's Practice Standards, the Rule 702 hearing addresses only the foundational requirement for challenged opinions, and the Court adjudicates only the specific challenges raised by the party opposing the opinions. The Court does not determine the weight or persuasiveness of the opinion, nor consider other evidentiary objections[2] which are more appropriately addressed at trial.

### 1. Burden of Proof

The proponent of the expert testimony bears the burden of proving the foundational requirements of Rule 702 by a preponderance of the evidence. *See Cook ex rel. Estate of Tessier v. Sheriff of Monroe County*, 402 F.3d 1092, 1107 (11th. Cir. 2005); *Daubert,* 509 U.S. at 592 n.10. As noted earlier, the proponent need not prove that the opinion is objectively correct, *see Mitchell v. Gencorp Inc.,* 165 F.3d 778, 781 (10th Cir. 1999), but only that the witness has sufficient expertise to choose and apply a methodology, that the methodology applied was reliable, that sufficient facts and data as required by the methodology were used and that the

---

[2]Such objections might include relevance (Fed. R. Evid. 401 and 403), the failure to timely disclose the opinions (Fed. R. Crim. P. 16(a)(1)(G) and (b)(1)(C)), whether a particular opinion is actually a conclusion of law (Fed. R. Evid. 704), etc.

methodology was otherwise reliably applied.  *See id.; Daubert,* 509 U.S. at 595; *see also Dodge v. Cotter Corp.*, 328 F.3d 1212, 1222 (10th Cir. 2003).  The burden on the proponent of the witness is an exacting one, as any inadequacy in the proof on any of Rule 702's elements renders the entire affected opinion inadmissible.  *Mitchell*, 165 F.3d at 782.

### 2. Rule 702 Analysis

In the 10th Circuit, the Rule 702 analysis has two steps: first, the Court determines whether the expert is qualified to render the proffered opinion, and second, the Court examines whether the opinion itself is reliable.  *103 Investors I, L.P. v. Square D Co.*, 470 F.3d 985, 990 (10th Cir.2006).  The second step of the analysis focuses on the process or means by which the witness derived the opinion - this is referred to as methodology or application of principles.  This analytical framework makes the Rule 702 determination more <u>opinion-centric</u> than <u>expert-centric</u>.[3]

### A.  Qualifications

Although Rule 702 continues to require that a witness have "expert[ise resulting from] knowledge, skill, experience, training, or education," such qualifications are considered relative to the particular opinion or testimony proffered.  *See United States v. Dysart*, 705 F.2d 1247, 1252 (10th Cir. 1983).  Any of these qualifications can be sufficient to support a finding that an expert is qualified.  *See* Fed. R. Evid. 702 Advisory Committee Notes, 2000 Amendments.[4]  Indeed, in

---

[3] As a result, the traditional practice of the proponent "offering" and the Court "receiving" a witness as an "expert" is now a meaningless and unnecessary gesture.

[4] Because the witness' qualifications must relate to the opinions offered in the present case, the fact that the witness has given expert testimony in other cases is not relevant unless the testimony was of the same nature using the same methodology.

some fields, experience alone is the "predominant, if not sole, basis for a great deal of reliable expert testimony." *See id.*

Some of the factors recited in *Daubert* are applicable to the question of whether the witness is sufficiently qualified. For example, the Court should consider whether the witness proposes to testify about matters growing naturally and directly out of research he or she conducted independent of the litigation, whether the witness developed opinions expressly for purposes of testifying, and whether the field of expertise claimed by the witness is known to reach reliable results for the type of opinion the witness intends to express.

## B. Deriving the opinion

As noted earlier, the current Rule 702 also requires that the means by which the testimony or opinion was derived be reliable. For this purpose, it sets out three specific requirements: (i) a showing that the method or principle used by the witness is reliable; (ii) a showing that the witness used sufficient facts and data as required by the method or principle; and (iii) a showing that the witness properly applied the method or principle to the collected facts and data.

### 1. Methodology

The requirement that an opinion be derived from reliable principles or methods, known colloquially as "methodology," involves two related inquiries: (i) what methodology did the witness use to reach the opinion; and (ii) is that methodology generally deemed "reliable" in the field in which the expert works. Both inquiries are entirely factual in nature, and the proponent of the opinion must establish both inquiries by sufficient, competent evidence.

Conceptually, determining the witness' methodology is as simple as asking "how?" — that is, "how did the witness reach his or her opinion or conclusion?". The answer might be relatively

simple. For example, the witness' "methodology" in reaching an opinion that an individual did not fire a gun might be based on the simple principle that powder residue is typically found on people who have fired guns. Or, a witness' methodology might involve several steps. For example, a witness opines that a vehicle was traveling 45 m.p.h. when it was involved in an accident. In describing how he or she reached that conclusion, the witness might explain that he or she first located the point of impact, then measured the distance the vehicle traveled from that point to determine its residual energy after the impact, then assessed whether environmental conditions would have affected the distance that the vehicle traveled after the impact, and finally, applied a mathematical formula to such data. The articulation of a methodology usually can be made without reference to the specific opinion or to any of the specific facts in the case; it is simply an explanation of the process the witness used.

The second inquiry is whether the methodology is sufficiently "reliable." Assessing the reliability of a methodology requires the Court to consider whether that methodology is "scientifically valid." *Hollander v. Sandoz Pharmaceuticals Corp.*, 289 F.3d 1193, 1204 (10th Cir. 2002); *Truck Ins. Exchange v. MagneTek, Inc.*, 360 F.3d 1206, 1210 (10th Cir. 2004). This does not mean that Rule 702 is limited to scientific opinions, *Kumho,* 526 U.S. at 152, but instead, is an inquiry into whether the methodology is a scientific or logical method[5] that can be replicated and validated.[6] *Id.*

---

[5]Often, methodology is stated as a formula – an equation or a logical "if X, then Y" statement. In the accident reconstruction example, the witness might testify that determination of the speed of impact requires application of a mathematical formula to specified factors.

[6]It is entirely reasonable to require an expert witness to understand and be able to explain how the methodology he or she used has been evaluated and why it is reliable. "Whether a witness can parrot the results of a model does not mean that he is qualified to explain how the

Depending upon the methodology, courts can consider a variety of appropriate factors in assessing reliability. These include, but are not limited to: (i) whether the methodology is one that can be tested or falsified – that is, whether the witness' approach can be challenged in some objective sense, or whether it is instead simply a subjective, conclusory approach that cannot reasonably be assessed for reliability; (ii) whether the method or technique has been subject to peer review and publication; (iii) whether there are known or potential rates of error with regard to the use of the method; and (iv) whether the method or approach has "general acceptance" in the scientific community.[7] *See Daubert,* 509 U.S. at 593-94; *Kumho Tire*, 526 U.S. at 149-50.

These factors are neither exclusive nor dispositive. For example, a methodology that does not enjoy peer review or testing may nevertheless be reliable simply because it constitutes a generally-accepted practice in the discipline. *See Bitler v. A.O. Smith Corp.*, 400 F.3d 1227, 1235 (10th Cir. 2004). However, a methodology might have near universal acceptance in a particular discipline, but a court may find that the entire discipline itself (*e.g.* astrology, dowsing) lacks any reliability. *Kumho*, 526 U.S. at 151. A court must necessarily assess these factors in light of each other, and of the particular circumstances of the case. For example, where the methodology proffered by the witness is novel or lacks general acceptance in the field, the need for the witness to validate the theory through more extensive testing increases. *See e.g. MagneTek*, 360 F.3d at 1212. Conversely, an otherwise reliable methodology does not become unreliable simply because the witness did not thoroughly test it in all applicable situations. Once a court is satisfied that the

---

model works or to opine on the statistical validity or interpretation of the results." *LifeWise Master Funding v. Telebank*, 374 F.3d 917, 928 (10th Cir. 2004) (emphasis in original).

[7]Many of the factors the Court considers with regard to one of the prongs of Rule 702 are equally applicable to other prongs as well.

methodology is generally reliable, suggestions that the witness should have engaged in additional testing to achieve certainty in his or her conclusions are matters going to the weight of the opinion, not its admissibility. *See Bitler*, 400 F.3d at 1236 & n. 2.

## 2. Facts and data

Next, the proponent of the opinion must show that the witness gathered "sufficient facts and data" to formulate the opinion. In the 10th Circuit, assessment of the "sufficien[cy]" of the facts and data relied upon by the witness is a <u>quantitative</u>, not a qualitative, analysis. Fed. R. Evid. 702, Advisory Committee Notes to 2000 Amendments; *see also United States v. Lauder*, 409 F.3d 1254, 1264 n.5 (10th Cir. 2005). In other words, the Court does not examine whether the facts obtained by the witness are themselves reliable – whether the facts used are qualitatively reliable is a question of the <u>weight</u> to be given the opinion by the factfinder, not the <u>admissibility</u> of the opinion. Rather, the inquiry examines only whether the witness obtained the amount of data that the methodology itself demands.

Returning to the accident reconstruction example, one of the factors in the methodology was a measurement of the distance between the point of impact and the place where the vehicle came to rest. The witness' testimony that he or she obtained a measurement of that distance is sufficient to satisfy the "facts and data" element of Rule 702 for that component of the methodology. Whether the witness obtained the measurement with a precision laser, with a household yardstick, or by roughly pacing off the distance on foot is irrelevant to the Rule 702 analysis. Such challenges bear on the <u>quality,</u> not the <u>quantity</u>, of the data obtained by the witness and thus, bear only upon the weight that should be afforded the witness' opinion at trial.

### 3. Application

Finally, the witness must reliably apply the methodology to the facts and data he or she has obtained. Once again, the requirement that the witness "reliably" do so is not an invitation to a court to assess the worth of the opinion itself. The Court's focus is simply upon whether the witness followed the dictates of the methodology in considering the facts and data.

In assessing the reliability of the witness' application of facts to methodology, the Court considers a variety of factors including, but not limited to, the following: (i) whether the expert employed the same degree of intellectual rigor in formulating the opinion as he or she would be expected to employ in his or her own professional life; (ii) whether the expert has unjustifiably extrapolated from an accepted premise to an unfounded conclusion (*i.e.,* whether there is too great an analytical gap between the data and the opinion proffered); and (iii) whether the expert adequately accounted for obvious alternative explanations. *See generally Kumho,* 526 U.S. at 152; *General Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).

The witness' explanation of how he or she applied the methodology may often reveal that although the opinion is based, in part, on facts, it is also based on assumptions and/or "component opinions." An expert witness may often "assume" a fact for purposes of applying the methodology. The assumption may be based upon information supplied to the witness or on someone else's work or opinion. For example, in the accident reconstruction scenario, the witness might testify that he or she does not specifically know what the subject vehicle actually weighed, and simply assumed that the vehicle was of a standard weight as described in various printed information. The witness relies upon the assumed fact when applying the methodology. An assumption must be clearly stated as such, because when an assumption is used, the opinion

becomes conditional. If the assumption is in error, the opinion may be entirely invalidated. *See e.g. Champagne Metals v. Ken-Mac Metals, Inc.*, 458 F.3d 1073, 1080 n 4. (10th Cir. 2006) ("Expert testimony that fails to make clear that certain facts the expert describes as true are merely assumed for the purpose of [the opinion] may not assist the trier of fact at all and, instead, may simply result in confusion").

Reliance on assumptions does not necessarily preclude the opinion from having an adequate foundation under Rule 702. The accuracy of the assumption is not at issue for Rule 702 purposes, but the importance of the assumption may be. Depending on the case, the assumed fact may be so critical to the methodology that the witness' failure to ascertain the <u>actual</u> fact would render the application of the facts to the methodology unreliable; in such circumstances, the opinion would fail under Rule 702. On the other hand, the assumed fact may be sufficiently peripheral to the analytical process that the experts in the same field would not hesitate to assume the fact's presence or absence when applying the methodology. The accuracy of the assumption is an issue for trial because it affects the weight of the opinion. If the assumption is necessary for application of the methodology, an opponent may attempt to disprove the assumed fact at trial. If the opponent is successful, the failure of the assumption may vitiate the expert's opinion. The application of the methodology may also reveal that witness has relied on other opinions. In the accident reconstruction example, the overarching opinion is that the vehicle's speed at impact was 45 m.p.h. However, in applying the methodology, the witness may have had to formulate an underlying opinion as to the location of the point of impact. This "component opinion" is essential to the application of the methodology. When that is the case, the component opinion must also be fully-supported under Rule 702, as well. (To suggest otherwise would permit

parties to admit opinions that fail the Rule 702 test through the "backdoor" by embedding them within a larger, overarching opinion.) Thus, a party proffering an opinion that depends upon one or more component opinions must also demonstrate that each component opinion satisfies all of the requirements of Rule 702. In the accident reconstruction example, the proponent of the speed-at-impact opinion would have to prove that the witness had the expertise, a sufficient methodology, and sufficient facts and data to formulate the component opinion as to the location of the point of impact.

## C. Applying the Analysis to Agent Lynch's Opinions

With these principles in mind, the Court now turns to the specific opinions offered by Agent Lynch.

Agent Lynch's qualifications are challenged with regard to all of his opinions. The Court's analysis of his expertise as it impacts a particular opinion is set forth below. Where not addressed, the Court finds that the qualifications are sufficient.

Agent Lynch has been a revenue agent with the IRS for 27 years. In that capacity, he has conducted audits of tax returns. Although Agent Lynch is licensed as a Certified Public Accountant, he has not engaged in public accounting nor performed a public audit of a person's or business' books and records in accordance with Generally Accepted Auditing Standards ("GAAS"). Although he testified that he thought that the methodology he used in this case complied with GAAS, he also admitted that he is not familiar with what portion(s) of the GAAS might apply to IRS tax audits or fraud audits. Agent Lynch is not a certified fraud examiner, does not consider himself an expert in employment taxes or worker classification, and cannot remember the last training that he had in such areas.

Agent Lynch's opinions were drafted by Government counsel, based in part, on the work of another revenue agent, Agent Robert Smith. Agent Lynch has adopted the opinions as his own after reviewing Agent Smith's workpapers.

## Opinion 1

### *"Columbine's Tax Returns and Filings Understated Wages Paid By Columbine to Its Employees as Follows:"*

| Quarter Ended | Unreported Wages |
|---------------|------------------|
| 3/31/99 | $249,814.61 |
| 6/30/99 | $283,353.34 |
| 9/30/99 | $300,157.30 |
| 12/31/99 | $394,088.52 |
| 3/31/00 | $417,396.94 |
| 6/30/00 | $492,721.25 |
| 9/30/00 | $639,148.92 |
| 12/31/00 | $813,028.74 |
| 3/31/01 | $943,070.11 |
| 6/30/01 | $1,113,907.47 |
| 9/30/01 | $1,300,219.05 |
| 12/31/01 | $1,392,831.54 |
| 3/31/02 | $1,163,228.37 |
| 6/30/02 | $1,102,174.38 |
| 9/30/02 | $-60 |
| 12/31/02 | $0 |
| Total | $10,605,080.54 |

The methodology underlying the ultimate opinion as stated by Agent Lynch – that

Columbine's tax returns understated wages by specific amounts – is a simple mathematical computation: (amount of wage payments made by Columbine to employees) minus (amount of wage payments reported by Columbine to the IRS) equals (the amount understated). The Defendants do not contend that this methodology is unreliable, nor do they dispute that, by resorting to the W-2 and Form 941 forms filed by Columbine, Agent Lynch obtained sufficient facts and data to calculate the amounts reported by Columbine to the IRS.

However, the Defendants dispute both the method and substance by which Agent Lynch derived the first factor – the actual wages paid by Columbine to its employees. Agent Lynch testified that he obtained the figures from Columbine's Tax Summary Report. Interestingly, Agent Lynch did not simply assume[8] that the figures in the Tax Summary Report were accurate; rather, he testified that he engaged in an "audit" to confirm the accuracy of the Tax Summary Report. In essence, Agent Lynch has testified as to a "component opinion" – *i.e.* based upon his audit, the figures in the Tax Summary Report are accurate.

Agent Lynch's determination that the Tax Summary Report accurately states that amounts paid by Columbine to its employees is an opinion - a component opinion - which is essential to Agent Lynch's application of the mathematical formula described above. As a component opinion, the Government bears the burden of proving that it satisfies Rule 702 - that it was derived using a reliable methodology that was reliably applied to sufficient facts and data.

Agent Lynch describes his methodology for determining the accuracy of the Tax Summary

_____

[8]Had Agent Lynch simply assumed that the Tax Summary Report was accurate, rather than independently investigating whether it was, the scope of the Rule 702 hearing would likely have changed. The Court would not then delve into the validity of the assumption, only whether making the assumption was consistent with a reliable methodology for performing the ultimate calculation.

Report as using an "audit." His audit consisted of the following steps. He learned that the Tax Summary Report (Ex. 3) was generated by software called "Checkmark."[9] Based on the data supplied to it, the software program performs various calculations and produces a Tax Summary Report, stating the amounts paid to employees, and income, payroll, social security, and medicare tax obligations resulting from those wage payments.

Agent Lynch interviewed the creators of the Checkmark software about how the program worked. Based upon their explanations,[10] but without interviewing Columbine employees as to what data was input into the program, Agent Lynch concluded that the program was "very" reliable. Then Agent Lynch proceeded to validate the figures stated in Columbine's Tax Summary Report. First, he compared the information on the Tax Summary Report to Columbine's own W-2 records, as well as to four amended Form 941 forms for the 2000 tax year, filed by Columbine in 2004. In this comparison, he found a discrepancy of $7,000 between the wages calculated by the Tax Summary Report and the wages Columbine reported to the IRS as paid. Second, Agent Lynch took a sample of wages paid to approximately 100 nurses,[11] as listed in the Tax Summary Report, and compared those sums to pay stubs and to Columbine's bank records. As to these sampled payments, he found no discrepancy. He therefore concluded that the figures on Columbine's Tax Summary Report accurately reflected wages paid.

---

[9] It is not clear from the record whether the Checkmark software was installed on Columbine computers and utilized by Columbine employees, or whether it was operated by an outside payroll service provider used the program for Columbine. However, it appears to be uncontroverted that the data input into the Checkmark program was provided by Columbine.

[10] The record contains no evidence of what the employees actually told Agent Lynch.

[11] The parties agree that Columbine employed hundreds of nurses in 37 states, but the record at this hearing does not reveal a specific number.

15

Agent Lynch considered this process to be an "adequate and in-depth audit of the books and records of Columbine Healthcare." He testified that this methodology was consistent with the "auditing standards that a revenue agent needs to apply in conducting an audit," but was not able to identify what portions of the Internal Revenue Manual or GAAS that he applied.

On cross-examination, Agent Lynch admitted that assessing Columbine's internal controls for financial information input into the Checkmark program was a necessary precursor (i) to determine whether sampling was an appropriate and sufficient means to determine the accuracy of the Tax Summary Report; and (ii) if sampling was an appropriate verification method, to establish how big the sample should be. However, he admitted that he did not investigate or evaluate Columbine's internal controls, or even consider them in determining whether to use sampling or to decide how big a sample to use. In addition, he testified that, based upon his casual observation, Columbine's internal controls appeared weak.

The Defendants offered the testimony of Sheri Betzer, a CPA and Certified Fraud examiner. Ms. Betzer worked for the IRS for 15 years, and for 17 years thereafter has been engaged in public accounting. Ms. Betzer began her career with the IRS by auditing tax returns, much like Mr. Lynch. However, during the last three years of her tenure, she served with IRS attorneys on the District Council, in which she prepared criminal tax cases for referral to the Department of Justice for prosecution.

Ms. Betzer testified that Agent Lynch's methodology in determining the accuracy of Columbine's Tax Summary Report in order to determine what wages were actually paid by Columbine was not consistent with generally accepted IRS auditing practices in criminal cases. Most importantly, she testified that use of sample payments to 100 nurses was not sufficient to

conclusively verify the contents of the Tax Summary Report. Based upon her experience with the IRS, Ms. Betzer testified that different standards applied in civil tax matters as compared to criminal prosecutions. With regard to a civil audit of a tax return, Ms. Betzer testified that a revenue agent might utilize a sampling of transactions to validate a taxpayer's records, as Agent Lynch did. However with regard to a criminal prosecution, she both used and expected that 100% of the reported transactions would be reconciled against external records such as bank records. In addition, she testified that she had attempted, but was unable, to reconcile certain wage payments reflected in the Tax Summary Report with Columbine's bank records.[12] Ms. Betzer's testimony on these points was unrebutted.

For the sake of argument, and because Agent Lynch testified as to some of the factors that one should consider in verifying the accuracy of taxpayer records, the Court finds that he has the requisite expertise, training and education to determine and express an opinion as to whether the Tax Summary Report was accurate. However, the Court finds that Agent Lynch did not use a reliable methodology and did obtain sufficient facts and data in order to reach the conclusion that the Tax Summary Report accurately stated the actual wage payments made by Columbine.

As discussed above, Agent Lynch attempted to validate the Tax Summary Report in two ways: (i) by comparing the contents of the Report with other tax filings made by Columbine; and (ii) by comparing a sampling of payments to 100 nurses as shown in the Report with data in pay stubs and bank records. With regard to the first approach, the Court finds that the Government failed to establish that it is either a reliable methodology or part of a reliable methodology used to

---

[12]Her testimony did not describe these payments, but they are described in her Report (Defendants' Ex. A) as direct deposit payments on various nurses' accounts.

verify the accuracy of a taxpayer's records. Neither Agent Lynch nor Ms. Betzer testified that this methodology is generally-accepted. Conceptually, it seems unlikely that such a methodology would yield reliable results. Presumably, a taxpayer would base its tax filings on its own records; thus, the fact that tax filings and records match does not attenst to the accuracy of the taxpayer's records. But in this case, there is no match - indeed, Agent Lynch found a $7,000 discrepancy between the Tax Summary Report and the tax filings. He offered no explanation as to how the comparative approach would account for a discrepancy while simultaneously leading to the conclusion that the Tax Summary Report was accurate.

As to Agent Lynch's sampling of payments to 100 nurses, there are numerous problems. First, this procedure is not generally relied upon in assessing the validity of taxpayer records in criminal tax prosecutions. Ms. Betzer's unrebutted testimony was that in criminal tax prosecutions, the IRS practice required reconciliation of 100% of the taxpayer reported wage payments with external sources. Agent Lynch did not testify to the contrary. Second, Agent Lynch did not reliably apply the sampling procedure. He admitted that in order to utilize a sampling procedure, he needed to assess Columbine's internal controls, but he did not do so. Finally, the Government did not establish that Agent Lynch used sufficient facts and data. As evidenced by Ms. Betzer's sample, certain payments were not accurately reported in the Tax Summary Report. Agent Lynch's use of 100 records to conclude that the Tax Summary Report was accurate in its entirety cannot be reconciled with Ms. Betzer's undisputed testimony that at least some of the entries in the Tax Summary Report were inaccurate. Based upon this record, the Court finds that Agent Lynch's sample was not sufficiently large or diverse enough to permit his methodology to reliably model the accuracy of the information in the Tax Summary Report.

Because the Court finds that Agent Lynch lacked a reliable methodology and sufficient facts to support his component opinion that the Tax Summary Report accurately reflected the wages paid by Columbine, the Government has not established that Agent Lynch's Opinion 1 is sufficiently reliable under Rule 702. Therefore, the Court finds that Opinion 1 is inadmissible.

**Opinion 2**

"***Columbine's Tax Returns and Filings Understated Columbine's Withholdings Made on Behalf of Its Employees as follows***"

| Quarter ended | Unreported Withholdings |
|---|---|
| 3/31/99 | $48,605.93 |
| 6/30/99 | $57,024.23 |
| 9/30/99 | $52,743.18 |
| 12/31/99 | $74,613.60 |
| 3/31/00 | $73,742.25 |
| 6/30/00 | $91,797.54 |
| 9/30/00 | $134,834.79 |
| 12/31/00 | $178,713.19 |
| 3/31/01 | $201,748.68 |
| 6/30/01 | $247,364.54 |
| 9/30/01 | $299,264.32 |
| 12/31/01 | $316,226.31 |
| 3/31/02 | $247,120.62 |
| 6/30/02 | $235,328.49 |
| 9/30/02 | $0 |
| 12/31/02 | $0 |
| Total | $2,259,127.64 |

This opinion is derived from Agent Lynch's comparison of the actual amounts withheld from the wages of Columbine employees with the amount withheld as reported by Columbine to the IRS. For this opinion, Agent Lynch relied on his conclusion that the Tax Summary Report accurately reflected wages that were actually withheld by Columbine.

For the same reasons discussed with regard to Opinion 1, Opinion 2 is inadmissible.

## Opinion 3

"***Columbine Withheld But Failed to Pay Over to the IRS Social Security Taxes, Medicare Taxes, and Income Taxes For a Large Majority of Columbine Employees as follows:***"

| Quarter ended | Unpaid Withholdings |
|---|---|
| 3/31/99 | $48,605.93 |
| 6/30/99 | $57,024.23 |
| 9/30/99 | $52,743.18 |
| 12/31/99 | $74,613.59 |
| 3/31/00 | $73,742.24 |
| 6/30/00 | $91,797.54 |
| 9/30/00 | $134,834.78 |
| 12/31/00 | $178,713.18 |
| 3/31/01 | $201,748.68 |
| 6/30/01 | $247,364.53 |
| 9/30/01 | $299,264.31 |
| 12/31/01 | $316,226.30 |
| 3/31/02 | $371,213.65 |
| 6/30/02 | $310,705.38 |
| 9/30/02 | $307,452.00 |
| 12/31/02 | $305,542.99 |

| | |
|---|---|
| Total | $3,071,592.51 |

This opinion derived from Agent Lynch's comparison of the amounts of wages actually withheld by Columbine with the amounts Columbine turned over to the IRS. As with Opinions 1 and 2, this opinion is predicated upon Agent Lynch's conclusion that the Tax Summary Report was accurate. Thus, for the same reason articulated with regard to Opinion 1, this opinion is also inadmissible.

## Opinion 4

"*Columbine Failed to Pay Its Share of Social Security Taxes and Medicare Taxes For a Large Majority of Its Employees as follows:*"

| Quarter Ended | Unpaid Employer Share of FICA |
|---|---|
| 3/31/99 | $19,110.81 |
| 6/30/99 | $21,676.53 |
| 9/30/99 | $23,676.53 |
| 12/31/99 | $30,147.78 |
| 3/31/00 | $31,930.86 |
| 6/30/00 | $37,693.17 |
| 9/30/00 | $48,894.89 |
| 12/31/00 | $62,196.70 |
| 3/31/01 | $72,144.92 |
| 6/30/01 | $84,892.53 |
| 9/30/01 | $98,915,10 |
| 12/31/01 | $104,475.34 |
| 3/31/02 | $123,918.28 |

| | |
|---|---|
| 6/30/02 | $120,109.49 |
| 9/30/02 | $119,019.51 |
| 12/31/02 | $95,071.83 |
| Total | $1,093,918.84 |

This opinion is Agent Lynch's calculation of Columbine's share of social security taxes and medicare taxes, based upon the wages paid as shown in the Tax Summary Report. Because this opinion is predicated upon Agent Lynch's conclusion that the Tax Summary Report was accurate, for the same reason articulated with regard to Opinion 1, this opinion is also inadmissible.

## Opinion 5

"***Columbine Underpaid Employment Taxes For All Quarters of 1999 Through 2002 Resulting in a Tax Loss As Follows***"

| Quarter Ended | Total Underpayment of Employment Taxes |
|---|---|
| 3/31/99 | $67,716.74 |
| 6/30/99 | $78,700.76 |
| 9/30/99 | $76,464.28 |
| 12/31/99 | $104,761.37 |
| 3/31/00 | $105,673.10 |
| 6/30/00 | $129,490.71 |
| 9/30/00 | $183,729.67 |
| 12/31/00 | $240,909.88 |
| 3/31/01 | $273,893.60 |
| 6/30/01 | $332,257.06 |
| 9/30/01 | $398,179.41 |

| | |
|---|---|
| 12/31/01 | $420,701.64 |
| 3/31/02 | $495,131.93 |
| 6/30/02 | $430,814.87 |
| 9/30/02 | $426,471.51 |
| 12/31/02 | $400,614.82 |
| Total | $4,165,511.35 |

No evidence was presented as to the methodology used to formulate this opinion. For that reason, alone, it is inadmissible. However, the Court surmises that it, like prior opinions, was derived from actual wages paid reported on Columbine's Tax Summary Report. To the extent that the Tax Summary Report was used by Agent Lynch as the record of actual wages paid, the opinion suffers from the same deficiencies as Opinion 1 and therefore is inadmissible for the same reasons.

**Opinion 6**

"***Global Management Was a Shell Company with No Substantive Business Activity***"

Global Management is a partnership of the Defendants, from which both Defendants received certain payments. Agent Lynch formulated this conclusion from reviewing the bank records of Global Management. He examined deposits and their sources, checks drawn on the account, and their payees. He describes this process as "basic auditing," which he uses as a revenue agent to determine who the taxpayer "really is." He acknowledges that there is no definition of "shell company" in the Internal Revenue Code, Internal Revenue Manual, or any other professional accounting treatise, but contends that it is accepted "professional lingo." According to Agent Lynch, whether an entity has substantive business activity depends upon its

"relationship with the parties," whether it has customers, whether it sells or purchases goods or services, and the nature of its income and expenditures.  For this assessment, Agent Lynch points to no particular Internal Revenue or other accounting standard.

The Defendants argue that (i) the Government has articulated no methodology that was used to derive this opinion; (ii) there is no generally-accepted definition for the term "shell company"; and (iii) that Agent Lynch did not apply a generally reliable standard or methodology to determine whether a company has "substantive business activity."

The Court agrees with the Defendants.  The essence of a reliable methodology is that the expert's theory can be challenged in some objective sense.  This is compared to a subjective, conclusory approach that cannot reasonably be assessed for reliability.  Without an accepted definition for "shell company" or standards by which one can determine whether an entity is engaged in "substantive business activity," this is nothing more than Agent Lynch's subjective opinion.  As such, it is inadmissible.

## Opinion 7

### "*$400,000 Paid to each of the Defendants by Global Management Was Income, Not a Loan*"

This opinion is a determination made by Agent Lynch after reviewing the financial records and bank records of Global Management, the financial records and bank records of Columbine, the work papers and statements by the CPA for both entities, and the tax returns of the Defendants.  Agent Lynch states that there are a number of factors that must be evaluated to determine whether a payment is a loan or income, but he did not articulate what these factors are, what he considered, what he found relative to each factor, and what weight he gave to each factor.  Instead, he states that there were certain facts that led him to reach this conclusion –

notably that there was no loan agreement, maturity date, commitment to repay, interest payments, etc.

The Defendants argue that Agent Lynch has not articulated a reliable methodology by which he made this determination.

The Court agrees with the Defendants. This opinion is a determination of both fact and law, one of the ultimate issues to be determined by a jury. Simply because an opinion embraces an ultimate issue of fact does not preclude its admission. *See* Fed. R. Evid. 704. However, an opinion on the ultimate issue of fact must nevertheless be supported by a reliable methodology, sufficient facts, and the reasonable application of the methodology to the facts.

Here, the Court accepts that there may be a number of factors that influence the determination of whether a payment is a loan or income for tax purposes. However, without a description of the objective framework that Agent Lynch applied and the manner in which it was applied, no reliable methodology has been articulated and without articulation, the Government has not established sufficient foundation for the opinion. It is therefore inadmissible.

## Opinion 8

### "*Both Defendants Underpaid Income Tax in 2001 as follows*"

| Defendant | 2001 Unpaid Income Tax |
|---|---|
| William Crabbe | $78,922.00 |
| James Rowan | $71,020.00 |

This opinion is predicated upon Opinion 7. Essentially, Agent Lynch opines that if the $400,000 paid to each Defendant is income, then each has underpaid his taxes by the specified amount. Agent Lynch computed the tax due by using IRS report generating software and the

information in each Defendant's 2001 tax return.

Although the Defendants raise the same four objections to this opinion as they have to all others, they make no specific challenge to Agent Lynch's qualifications or with regard to the methodology employed by Agent Lynch – that is, to the use of the IRS report-generating software or to the data drawn from the Defendants' tax returns to facilitate its calculation. The Court understands that their real objection is the same as with the prior opinion - the characterization of the payment as income.

Because the Government will not be able to offer the prior opinion upon which this calculation is premised, the predicate for this opinion becomes Agent Lynch's <u>assumption</u> that the $400,000 sum is income. As discussed above, Rule 702 is not a means by which the Court evaluates the assumptions underlying an expert's opinions. To the extent that the opinion is predicated on the assumption that the payment was income, the Defendants' objections to Opinion 8 are overruled. However, as with all opinions predicated on assumptions, if the Defendants challenge the validity of that assumption at trial, the Government will bear the burden of demonstrating that the assumed fact – that the loans are income – is true.

## CONCLUSION

For the foregoing reasons, the parties' Joint Motions Under Fed. R. Evid. 702 (**# 148, 149**) are **GRANTED IN PART**, insofar as the Court finds Opinions 1-7 of Agent Lynch to be inadmissible at trial, and **DENIED IN PART**, insofar as a sufficient foundation under Rule 702 has been shown with regard to Opinion 8.

Dated this 14th day of January, 2008

**BY THE COURT:**

Marcia S. Krieger
United States District Judge