UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Honorable Marcia S. Krieger

Criminal Action No. 06-cr-00294-MSK

UNITED STATES OF AMERICA,

      Plaintiff,

v.

WILLIAM C. CRABBE,

      Defendant.

---

## OPINION AND ORDER DENYING MOTION FOR JUDGMENT OF ACQUITTAL AND DENYING MOTION FOR NEW TRIAL

---

**THIS MATTER** comes before the Court pursuant to Mr. Crabbe's Motion for Judgment of Acquittal **(# 208)**, the Government's response **(# 224)**, and Mr. Crabbe's reply **(# 228)**; and Mr. Crabbe's Motion for New Trial **(# 231)**, the Government's response **(# 233)**, and Mr. Crabbe's reply **(# 236)**.

## BACKGROUND

On July 25, 2006, Mr. Crabbe was charged in a 36-Count Indictment **(# 1)**. Counts 1-7 alleged that Mr. Crabbe, acting on behalf of his business, Columbine Health Care, Inc. ("Columbine"), failed to remit Social Security, Medicare, and Income Tax withholdings that Columbine had made from its nurse employees' paychecks for each fiscal quarter between June 30, 2000, and December 31, 2001, in violation of 26 U.S.C. § 7202. Counts 8-11 alleged a similar failure to remit withheld taxes on behalf of both nurses and corporate employees for each

1

fiscal quarter between March 31, 2002, and December 31, 2002.  Counts 12-18 charged Mr.

Crabbe with failing to pay Columbine's share of Social Security and Medicare taxes, in violation

of 26 U.S.C. § 7203, for the period of June 2000 - December 2001, and Counts 19-22 alleged the

same crime for the period of March 2002 to December 2002.  Counts 23-34 alleged that Mr.

Crabbe filed false Quarterly Federal Tax Returns ("Form 941" or "941s") on behalf of

Columbine for the fiscal quarters between March 31, 1999, and December 31, 2001, in violation

of 26 U.S.C. § 7206(1).  Finally, Count 35[1] accused Mr. Crabbe of tax evasion relating to his

own 2001 personal Income Tax return, in violation of 26 U.S.C. § 7201.

Prior to trial, the Government dismissed Counts 12-22, and on February 19, 2008, Mr.

Crabbe proceeded to trial on the remaining counts.   At the conclusion of a 12-day jury trial, the

jury rendered the following verdict:

| Count | Crime charged | For Period Ending | Verdict |
|:---:|:---:|:---:|:---:|
| 1 | failure to remit withheld funds (nurses) | June 30, 2000 | Not guilty |
| 2 | failure to remit (nurses) | September 30, 2000 | Guilty |
| 3 | failure to remit (nurses) | December 31, 2000 | Guilty |
| 4 | failure to remit (nurses) | March 31, 2001 | Guilty |
| 5 | failure to remit (nurses) | June 30, 2001 | Guilty |
| 6 | failure to remit (nurses) | September 30, 2001 | Guilty |
| 7 | failure to remit (nurses) | December 31, 2001 | Guilty |
| 8 | failure to remit (nurses & corporate employees) | March 31, 2002 | Guilty |
| 9 | failure to remit (nurses & corporate employees) | June 30, 2002 | Guilty |

[1]Mr. Crabbe here was not charged in Count 36 of the Indictment.

| | | | |
|---|---|---|---|
| 10 | failure to remit (nurses & corporate employees) | September 30, 2002 | Guilty |
| 11 | failure to remit (nurses & corporate employees) | December 31, 2002 | Guilty |
| 23 | filing false 941 return | March 31, 1999 (filed[2] May 30, 2001) | Not guilty |
| 24 | filing false 941 return | June 30, 1999 (filed May 30, 2001) | Not guilty |
| 25 | filing false 941 return | September 30, 1999 (filed May 30, 2001) | Not guilty |
| 26 | filing false 941 return | December 31, 1999 (filed May 30, 2001) | Not guilty |
| 27 | filing false 941 return | March 31, 2000 (filed May 30, 2001) | Not guilty |
| 28 | filing false 941 return | June 30, 2000 (filed May 30, 2001) | Not guilty |
| 29 | filing false 941 return | September 30, 2000 (filed June 1, 2001) | Guilty |
| 30 | filing false 941 return | December 31, 2000 (filed June 15, 2001) | Guilty |
| 31 | filing false 941 return | March 31, 2001 (filed July 25, 2001) | Guilty |
| 32 | filing false 941 return | June 30, 2001 (filed November 5, 2001) | Guilty |
| 33 | filing false 941 return | September 30, 2001 (filed November 26, 2001) | Guilty |

[2]The dates upon which the 941s were filed as alleged in the Indictment differed slightly from the proof at trial. The numbers in this chart reflect the dates alleged in the Indictment. Elsewhere in this Order, the Court identifies the dates upon which Mr. Crabbe signed each 941, and assumes that they were filed shortly thereafter.

| 34 | filing false 941 return | December 31, 2001 (filed September 6, 2002) | Guilty |
|----|-------------------------|---------------------------------------------|--------|
| 35 | tax evasion (personal income tax) | Tax year 2001 | Not guilty |

Mr. Crabbe filed the instant Motion for Judgment of Acquittal (**# 208**), raising three arguments: (i) with regard to Counts 2-11, and Counts 29-34 as they related to the nurses, there was insufficient evidence to establish that the nurses were "employees" of Columbine; (ii) with regard to Counts 29-34, there was insufficient evidence to establish that Mr. Crabbe knew that the 941s he was filing contained false statements; and (iii) with regard to Counts 2-11, there was insufficient evidence to establish that Mr. Crabbe's failure to remit the withheld taxes was willful.

Separately, Mr. Crabbe filed a Motion for New Trial (**# 231**), arguing: (i) the Government made material misrepresentations in its closing argument, namely, that it misleadingly stated that the employees of Columbine had been "burned" by the failure of Columbine to remit the funds withheld from their paychecks; (ii) the "weight of the evidence" established that the nurses were not employed by Columbine; and (iii) the "weight of the evidence" established that former co-defendant James Rowan was solely responsible for Columbine's actions, the "Defendant's involvement with Columbine was minimal," and that Mr. Rowan "consistently excluded [Mr. Crabbe] from the management of Columbine," all of which appear to be presented cumulatively to further Mr. Crabbe's subsequent argument that the evidence does not support Mr. Crabbe's knowledge of Columbine's filing errors, nor his intent to conceal them; and (iv) the Court's rulings prevented Mr. Crabbe from putting on a complete defense, insofar as the Court excluded "evidence concerning Mr. Rowan's historical control"

over previous corporate entities, forced the defense to present witnesses out of Mr. Crabbe's intended order, and failed to compel the production of certain documents subpoenaed by Mr. Crabbe.

## FACTS

For purposes of context, the Court briefly summarizes the evidence produced at trial. A more detailed recitation of the relevant evidence is found in the analysis below.

Columbine is a nurse-staffing agency that contracts with hospitals, nursing homes, and other health care institutions[3] to supply the institutions with nurses on a short-term basis. Columbine was owned primarily by Mr. Crabbe and former co-defendant, James Rowan, in equal proportions, with a small share of the company held by third parties. Mr. Rowan was the President of Columbine, and was its primary manager. Most witnesses agreed that, in terms of Columbine's operations, Mr. Rowan's "second-in-command" was Jeff Carlson, Columbine's Director of Corporate Development. Mr. Crabbe was Vice-President of Columbine, but witnesses generally agreed that he was significantly less involved in Columbine's day-to-day operations than either Mr. Rowan or Mr. Carlson. There was ample testimony that Mr. Rowan ran Columbine in a particularly despotic manner, sometimes instructing employees not to discuss matters with Mr. Crabbe, or otherwise marginalizing Mr. Crabbe's involvement with the business.

Columbine's business was to match up nurses seeking work with hospitals temporarily requiring additional nursing staff. If Columbine could successfully match up an interested nurse

---

[3]Several witnesses referred generically to the institutions Columbine serviced as "hospitals." The Court adopts that practice in this opinion.

with the skills the hospital sought, the nurse would be dispatched to the hospital's location for what was typically a multi-week assignment to perform tasks under the hospital's direct supervision. Whether this arrangement rendered the nurses employees of Columbine, employees of the hospital, or independent contractors was a central issue of dispute, both at trial and on the instant motions, and is discussed in greater detail herein.

Nurses generally reported their time to Columbine, and an employee in Columbine's office (non-nurse employees of Columbine were generally referred to as "corporate employees," and the Court will hereafter use that phrase) entered the nurses' hours into Checkmark, Columbine's computerized payroll system. The Checkmark program calculated the appropriate payroll deductions to make from each nurse's paycheck for income tax withholding, Social Security taxes, and Medicare taxes, and would print out corresponding paychecks and check stubs. Columbine went through the same process in preparing and issuing payroll checks for corporate employees, although the payroll data for corporate employees was stored in a Checkmark database separate from that of the nurses. The employee preparing payroll checks then brought them to a Columbine official to sign – most often Mr. Rowan or Mr. Carlson, but there was evidence that the Defendant occasionally signed paychecks as well. Mr. Crabbe testified that he had a "habit" of signing anything that was put in front of him, and that he would not actually review the paychecks or other documents he was asked to sign.

By law, employers are required to file a quarterly statement with the I.R.S. – referred to herein as "Form 941" or "941" – reporting their employee payroll for the relevant quarter, and remitting payment of income and Social Security taxes that have been withheld from employee paychecks. For some of the periods at issue, a corporate employee at Columbine timely prepared

6

the company's 941s, but was directed by either Mr. Rowan or Mr. Carlson to simply place the 941s in a filing cabinet rather than submitting them to the I.R.S. with payment. There was no evidence that Mr. Crabbe was involved with or aware of this practice. However, there was evidence that Wayne Hoover, Columbine's accountant, was aware of Columbine's mounting unpaid employment tax liability. He reported the liability on Columbine's financial statements that were available to Mr. Rowan and Mr. Crabbe. In addition, Mr. Hoover "hammer[ed] on" Mr. Rowan, Mr. Carlson, and Mr. Crabbe about the company's tax liability.

In 1999, concerned about Columbine's tax problems, Mr. Crabbe prevailed upon Mr. Rowan to retain Roni Deutsch, a tax attorney that Mr. Crabbe had seen in a television commercial. Mr. Rowan agreed to retain Ms. Deutsch to provide general advice, but did not want to communicate with the I.R.S. until an imminent increase in Columbine's revenues would permit the company to rectify its tax problems. Pursuant to Ms. Deutsch's suggestion that Columbine focus on staying current with its present tax obligations, Mr. Crabbe secured Mr. Rowan's agreement to concentrate on current tax reporting, and for a period of a few months in 1999, Columbine promptly reported and paid its current tax obligations as they fell due. However, shortly thereafter, other business priorities and concerns arose, and Columbine again ceased all tax reporting and remittance.

At some point in late 1999, Mr. Crabbe learned that Mr. Rowan had written himself $10,000 worth of checks out of Columbine's operating bank account at Centennial Bank. Observing that Columbine had weak financial tracking and control systems, Mr. Crabbe decided to undertake a project to create a computerized "check register" that would track the balance on the company's bank accounts. He obtained copies of the company's monthly bank statements,

both present and past, but he denies that he scrutinized the statements in any great detail (and thus, denies noticing that Columbine had written few checks to the I.R.S.). Instead, Mr. Crabbe testified that the only purpose of the check register program was simply to generate a current bank balance. When he completed the check register program several months later in 2000 and revealed it to Mr. Rowan, Mr. Crabbe was told by Mr. Rowan that Columbine's accountant, Mr. Hoover, reconciled the company's bank statement each month and that development of the check register program had been a useless exercise.

In 2000, without Mr. Rowan's knowledge, Mr. Crabbe arranged for Columbine to open a bank account at Bank One, which was separate from the company's normal operating account at Centennial Bank. Mr. Crabbe testified that he established the Bank One account with the intent of keeping some company funds from Mr. Rowan's access, in order to prevent him from plundering those funds for his own benefit as he had with the Centennial Bank account. In addition, Mr. Crabbe testified that he intended to use the Bank One account to pay Columbine's taxes without having to seek Mr. Rowan's approval. The record reflects that Mr. Crabbe signed the majority of the checks issued out of the Bank One account.

In the Spring of 2001, Mr. Crabbe was contacted by Ms. Deutsch, wondering what further steps the company wanted her to take. She again recommended that Columbine attempt to stay current on its taxes, and Mr. Crabbe spoke to Mr. Rowan about this issue. Mr. Rowan acknowledged that the company was now experiencing high revenues, and suggested that both men increase their draws of profits from the company. Concerned about the outstanding tax issue, Mr. Crabbe agreed to increase the owners' draws, but in exchange, secured Mr. Rowan's promise to use some of Columbine's funds to address its outstanding taxes. According to Mr.

Crabbe, they agreed that Mr. Crabbe would do the work to prepare the past-due 941s and that Mr. Rowan would be responsible for filing the current and future 941s.

Not having prepared a 941 before, Mr. Crabbe asked Mr. Rowan how to do so. Although he knew that corporate employees had previously prepared 941s for the company and that Mr. Hoover, as the company's accountant, would be familiar with its payroll, Mr. Crabbe did not ask for advice from them, and instead, allegedly relied solely upon Mr. Rowan's instructions. Mr. Rowan told Mr. Crabbe to simply use the "print 941" function on the Checkmark payroll software. Mr. Crabbe contends that he had no other involvement with the Checkmark program, was not told, and did not realize that the payrolls for the nurses and the corporate employees were maintained in separate databases, such that completing an accurate 941 would require generating a 941 report from each database and then adding the two amounts together. Instead, he accessed the file entitled "Columbine" on the Checkmark program – that is, the corporate employee payroll – and printed the 941 for that account. Because the printout was skewed and contained an incorrect mailing address, Mr. Crabbe retrieved a blank 941 form and re-typed the information from the Checkmark program onto the form. He contends that he never realized that each of the 941s he prepared reflected only the corporate employee payroll and states that the payroll numbers on the form "seemed right" to him, based on his limited understanding of Columbine's finances.

Over the span of a few months, Mr. Crabbe completed and filed several 941s:

| **Financial Quarter** | **Date signed** |
|-----------------------|-----------------|
| Q1 1999 | May 21, 20001 |

| | |
|---|---|
| Q2 1999 | May 21, 2001 |
| Q3 1999 | May 21, 2001 |
| Q4 1999 | May 21, 2001 |
| Q1 2000 | May 21, 2001 |
| Q2 2000 | May 24, 2001 |
| Q3 2000 | June 1, 2001 |
| Q4 2000 | June 15, 2001 |
| Q1 2001 | July 25, 2001 |

These filings brought Columbine current[4] on its 941 filings.

Although the agreement was that, once the delinquent 941s had been filed, Mr. Rowan would take responsibility for filing Columbine's 941s, it became clear to Mr. Crabbe that Mr. Rowan was not going to honor that agreement, and thus, Mr. Crabbe continued to prepare and/or sign 941s for Columbine:

| **Financial Quarter** | **Date signed** |
|---|---|
| Q2 2001 | November 2, 2001 |
| Q3 2001 | November 2, 2001 |
| Q4 2001 | September 6, 2002 |

Notably, Mr. Crabbe testified that, unlike the 941s he prepared and signed in the summer of 2001, an unknown Columbine employee prepared the 941s for Q2-Q4 2001 and simply presented them to Mr. Crabbe to sign. Unlike the 941s that Mr. Crabbe admittedly prepared – which left Line 1, "Number of employees" blank – the 941s for Q2-Q4 2001 expressly represented that Columbine employed between 21 and 31 employees during the relevant

---

[4]Q2 of 2001 ended on June 30, 2001, but the deadline for filing the 941 for Q2 2001 was on or about July 31, 2001.

quarters. This assertion was patently untrue, as Mr. Crabbe and others testified that Columbine typically had more than one hundred nurses in its employ at any given time.

At some point during or after October 2002, Mr. Hoover had learned that the 941s signed by Mr. Crabbe falsely omitted the nurses, and Mr. Hoover advised Mr. Crabbe of that fact. Mr. Crabbe asked Mr. Hoover what should be done, and Mr. Hoover suggested that Mr. Crabbe seek advice from the company's tax attorney. At or about this time, Mr. Hoover instructed a corporate employee to begin preparing corrected amended 941s.

In approximately July 2003, the IRS determined that Columbine was in arrears on its tax payments and filing obligations, and IRS Agent Pat Korb contacted Columbine on two occasions, speaking to Mr. Crabbe both times. Ms. Korb informed Mr. Crabbe that Columbine had not filed 941s for Q1 and Q2 of 2002, and tendered I.R.S.-prepared 941s for those periods to Mr. Crabbe to sign. Mr. Crabbe refused to do so, deferring the matter to Mr. Rowan and Greg Segal, a tax attorney that had been hired to assist Columbine with its problems.

By July 2004, Columbine had become the subject of a criminal tax investigation, and IRS Special Agent Robert Smith served a number of grand jury subpoenas on both Columbine and Mr. Crabbe. By this time, work had allegedly been underway on the corrected 941s for more than a year, yet no amended forms had been filed. After Mr. Crabbe had learned of the criminal investigation, he contacted Mr. Hoover to ascertain the status of the project – Mr. Crabbe had had no involvement in correcting the 941s to date – and learned that the project had apparently stalled. In early August 2004, Mr. Crabbe filed Amended 941s for Columbine for Q1 1999 through Q4 2002 that accurately reflected both the nurse and corporate employee payrolls.

**ANALYSIS**

**A. Motion for Judgment of Acquittal**

In determining the Motion for Judgment of Acquittal, the Court examines whether any reasonable juror could have found Mr. Crabbe guilty beyond a reasonable doubt, and does so viewing the evidence in the light most favorable to the Government and drawing any reasonable inferences therefrom. *U.S. v. Vigil*, ___ F.3d ___, 2008 WL 1869038 (10th Cir., Apr. 29, 2008), *citing U.S. v. Burkley*, 513 F.3d 1183, 1188, 1190 (10th Cir. 2008). The evidence supporting the conviction must be substantial, and do more than raise a mere suspicion of guilt, but the Government need not conclusively exclude every other reasonable hypothesis, and it need not negate all possibilities except guilt. *Burkley*, 513 F.3d at 1188. In determining the elements that the Government was required to prove, the Court is guided both by substantive law, as well as by the jury instructions to which the Government did not object. *U.S. v. Nacchio*, 519 F.3d 1140, 1157 (10th Cir. 2008) (if the instructions created additional burdens the Government must meet, it must meet those burdens as well).

       1. Status of nurses as employees

Mr. Crabbe argues that the evidence was insufficient to establish that the nurses were "employees" of Columbine. All of the counts upon which Mr. Crabbe was convicted turn, at least in part,[5] on whether the nurses could legally be found to be employees of Columbine.

---

[5]Counts 2-7 allege that Columbine failed to remit withholdings from nurses' paychecks. If there was insufficient proof that the nurses were Columbine's employees, Columbine would have had no legal duty to withhold and remit those funds, and thus, the Defendant would be entitled to acquittal on those counts. Counts 8-11 allege that Columbine failed to remit withholdings from both nurses and corporate employees, and in this respect, even if Mr. Crabbe was correct that the nurses were not employees of Columbine, there was adequate evidence that Columbine failed to remit withholdings from corporate employees. Thus, he would not be entitled to acquittal on Counts 8-11. As to Counts 29-34, those counts turn on the assertion that the 941s filed by Mr. Crabbe reflected only the corporate employee payroll, not nurses. If the

The Court instructed the jury that:

> . . . Columbine Healthcare Systems, Inc. was an employer, and the nurses were its employees, if the nurses performed services for Columbine Healthcare Systems, Inc., and, as to those services, Columbine Healthcare Systems, Inc. had the right to control and direct both the result of the services, as well as the means and manner by which the nurses performed such services.
>
> You should consider all of the circumstances surrounding the relationship between the nurses and Columbine Healthcare Systems, Inc. There are many factors you can consider, but no one factor is determinative. For example, you may consider: the extent to which Columbine Healthcare Systems, Inc. had the right to hire or fire the nurses; the extent to which it had the right to instruct the nurses as to where, when, and how their work was to be performed; the extent to which it provided the nurses with training or instruction; whether it required nurses to comply with its own policies and procedures; the extent to which it paid the nurses on an hourly basis or similar method that tied their compensation to the time or effort spent on the job; the extent to which it provided the nurses with tools, equipment, and supplies necessary to perform their work; the extent to which the nurses offered their services to the public at large, or to only one or a handful of "employers" at a time; and the extent to which Columbine Healthcare Systems, Inc. and the nurses generally understood and intended that the nurses would be employees of Columbine Healthcare Systems, Inc. These factors are not exclusive, and you may consider any other factors that you find bear on the question of whether Columbine Healthcare Systems, Inc. was an employer and the nurses were its employees.

This instruction was derived from the Internal Revenue Code, which states that whether one is an "employee" is determined under "the usual common law rules applicable in determining the employer-employee relationship." 26 U.S.C. § 3121(d), § 3401(c); *Enochs v.*

---

nurses could not be considered employees of Columbine for tax purposes, the 941s filed by Columbine would not have been false, and thus, Mr. Crabbe would be entitled to acquittal on these counts.

*Williams Packing & Nav. Co.*, 370 U.S. 1, 3 (1962). The Internal Revenue Service has promulgated guidelines to assist in this determination. Those guidelines state:

> Generally, [an employer-employee] relationship exists when the person for whom services are performed has the right to control and direct the individual who performs the services, not only as to the result to be accomplished by the work but also as to the details and means by which that result is accomplished. That is, an employee is subject to the will and control of the employer not only as to what shall be done but how it shall be done. In this connection, it is not necessary that the employer actually direct or control the manner in which the services are performed; it is sufficient if he has the right to do so. The right to discharge is also an important factor indicating that the person possessing that right is an employer. Other factors characteristic of an employer, but not necessarily present in every case, are the furnishing of tools and the furnishing of a place to work, to the individual who performs the services. In general, if an individual is subject to the control or direction of another merely as to the result to be accomplished by the work and not as to the means and methods for accomplishing the result, he is an independent contractor. . . .

26 C.F.R. § 31.3121(d)-(1)(C)(2).

In attempting to animate these concepts, courts have articulated a variety of factors that should be considered in evaluating the putative employment relationship. *See Eastern Invs. Corp. v. U.S.*, 49 F.3d 651, 653 (10th Cir. 1995) *and cases cited therein*. Different courts have articulated the relevant factors differently, with some courts focusing on a handful of major considerations, *see e.g. Dole v. Snell*, 875 F.2d 802, 805 (10th Cir. 1989) (identifying the degree of control exerted over the worker; the worker's opportunity for profit or loss; the worker's investment in the business; the permanence of the working relationship; and the degree of skill required to perform the work, and the extent to which the work is integral to the alleged employer's business); some courts considering many additional factors, *see e.g. Darden*, 503 at 323-24 (listing 12 factors, including "the provision of employee benefits" and "the tax treatment

14

of the hired party"); and in a 1987 Revenue Ruling that has been cited with approval by both the Supreme Court and the 10th Circuit, the I.R.S. listed 20 factors to be considered. Rev. Rul. 87-41, 1987-1 Cum. Bull. 296, 288-89 (1987), *cited in Darden*, 503 U.S. at 324 *and Eastern*, 49 F.3d at 653. Ultimately, there is "no shorthand formula or magic phrase that can be applied to find the answer . . . all of the incidents of the relationship must be assessed and weighed with no one factor being decisive." *Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 324 (1992); *see also Eastern*, 49 F.3d at 653 ("[e]ach factor may not have application to every situation, however, and no one of these factors in isolation is dispositive").

There is little need to engage in a detailed analysis of five, twelve, or even twenty factors in this case because judgment of acquittal here is not appropriate. The standard of review on a motion for judgment of acquittal requires the Court to view the evidence in the light most favorable to the Government. *Vigil, supra.* Where the jury is asked to reach a conclusion by weighing a number of discrete factors, none of which are dispositive, the Court's role is simply to determine whether there was evidence as to one or more factors that would point to Columbine as the employer of the nurses. If the jury could have found evidence as to one or more factors to tip that factor in favor of a conclusion that Columbine employed the nurses, the jury could also have concluded that that/those factor(s) outweighed any countervailing factors. On this extremely deferential standard of review, the Court has no difficulty in finding that some of the factors identified in prior cases clearly point to Columbine, not the hospitals, as the nurses' employer. Of those factors recited by the 10th Circuit in *Dole*, it is clear that the performance of tasks by the nurses was the *sine qua non* of Columbine's business, whereas the nurses' services were only one component of the business of the hospitals. Considering the more expansive list

of factors in *Darden*, it is patently clear that Columbine, not the hospitals, furnished employee benefits and treated the nurses as employees for tax purposes. Under these circumstances, the Court finds that, taken in the light most favorable to the Government, there was evidence from which a reasonable juror could have weighed the various factors so as to conclude that the nurses were Columbine's employees.

Alternatively, one could characterize the analysis on a motion for judgment of acquittal as warranting relief where the evidence, viewed in the light most favorable to the Government, compels a conclusion that, as a matter of law, the nurses were not Columbine's employees. Assuming this is Mr. Crabbe's position, it is also without merit. To address this issue, the Court briefly recaps the evidence from trial as it relates to the nurses' work.

Nurses who sought work through Columbine were provided with a packet of information, and several forms to fill in. The first page of the packet recited a number of understandings between Columbine and the nurse, and the nurse was required to initial each separate paragraph. Among the understandings recited on the form was a statement that "I understand that I will be acting as an employee of Columbine and that all taxes and other appropriate deductions shall be made from my compensation as provided by law." Other statements on the same form referred variously to the nurses "accepting employment" with Columbine and Columbine "terminat[ing] my employment," among other things. Interested nurses were also supplied with an Employee's Withholding Allowance Certificate, IRS Form W-4, which instructed Columbine as to the proper amount of wages to be withheld and paid over to the IRS for employee income tax purposes. Nurses were also provided with a skills inventory and other documents, which Columbine would

use keep track of their professional certifications, skills, training, preferences, and other information.

If, for example, a hospital expressed an interest in obtaining a nurse with obstetrics training, Columbine would canvass its database for qualified obstetric nurses whose indicated preferences as to location, hours, etc. matched the request of the hospital. Columbine would then contact the nurse with details of the possible assignment, and, if the nurse was interested, Columbine would arrange a telephone interview between the nurse and a representative of the hospital. Assuming both the nurse and the hospital continued to be interested following the phone interview, Columbine would enter into two separate contracts – one with the hospital, and one with the nurse. The contract with the hospital, known as a "Facility Agreement," provided, among other things, that "[Columbine], as employer, takes responsibility for its employees' employment taxes and shall deduct and pay applicable FICA, Federal and State withholding taxes." Ex. 75. In addition, Columbine agreed to be responsible for the nurses' professional liability, Worker's Compensation, and unemployment insurance. The Facility Agreement stated that the hospital and Columbine "shall jointly plan and implement medical professional care services on a planned or as-needed basis in meeting the staffing requirements of the [hospital]." Separately, Columbine would enter into a contract with the nurses, entitled "Agreement to Provide Services," in which the parties agreed that the nurses would provide services at a particular hospital for a particular period of time, at a stated hourly wage, and with Columbine reimbursing certain specified expenses incurred by the nurse.

Columbine would typically reimburse the nurse for travel costs, and would often arrange for and incur the cost of an apartment lease or other housing arrangements for the nurse in the

work location.  The nurse would report to the hospital at a designated date and time and would

be provided with an orientation and instructions from a hospital staff member.  For general day-

to-day activities, the nurse would be instructed and supervised by a hospital staff member, with

no direct oversight by Columbine.  However, the hospital's ability to instruct the nurses was

partially constrained by the terms of the Facility Agreement.  As stated above, the Facility

Agreement ostensibly required the hospital and Columbine to "jointly plan and administer" the

medical services the nurse was to perform, although the evidence at trial indicated few of

Columbine's recruiters – the single point of contact between Columbine and the hospitals – had

any medical training or experience, and there was no evidence that recruiters actually consulted

with the hospitals on day-to-day tasks to be performed by the nurses.  The Facility Agreement

further provided that the nurses' actions were to fall within "the scope and limitations set forth

by professional medical specialities," and required that Columbine give prior written consent

before the nurses could be asked to "administer medications or operate the hospital's

equipment."   No testimony elaborated on the extent, if any, to which Columbine actually

enforced the requirement that it give consent before the hospitals could instruct the nurses to

administer medication or operate equipment.

Nurses on assignment were subject to the policies and practices of the hospital.  In part,

the requirement that they obey hospital policies was created by Columbine, as the result of the

initial "understandings" page of the nurses' employment packet which recites that the nurse will

"abide by all rules and regulations of the facilities where placed."   In addition to any policies

imposed by the hospital, nurses were subject to several additional requirements dictated by

Columbine.  Nurses had to wear a Columbine-issued name tag along with any hospital-issued

identification.  Nurses were prohibited by the "understandings" page of the employment packet from: (i) discussing their rate of pay or other terms of compensation with staff of the hospital; (ii) discussing "any problems concerning working conditions at the Facility" with anyone other than Columbine; and (iii) discussing any possibility or offer of employment with the hospital itself while on an assignment.  Columbine required that nurses submit time cards by 10:00 a.m. on Mondays.

Columbine did not directly supervise the day-to-day activities of its nurses, but several of Columbine's recruiters testified that they maintained occasional contact with a representative of the hospital, or with the nurse him- or herself, to ensure that the assignment was proceeding as agreed and to address any issues or problems that might arise.  Only recruiter Mary Dunne, testifying by deposition, stated that she would have no further communication with the hospital after placing a nurse.  Ms. Dunne's contention appears to be at least somewhat inconsistent with the terms of the Facility Agreement, which states that Columbine will periodically evaluate each nurse and will require input from the hospitals "to assist" in those evaluations.  All of the witnesses agreed that if a nurse had a problem with an assignment, he or she would not deal with the hospital directly, but would contact Columbine, and Columbine would contact the hospital to resolve the problem.  Similarly, if the hospital was dissatisfied with a nurse's services, the hospital would contact Columbine, and it was up to Columbine to decide whether to terminate or reassign the nurse, or to take some other action.[6]

---

[6]There was no evidence that a situation ever arose in which a hospital was dissatisfied with a nurse's performance, but Columbine did not agree with the criticism and refused to remove the nurse.

The Court notes that, on these facts, this case bears a striking similarity to a hypothetical presented by the I.R.S. in the 1987 Revenue Ruling:

> SITUATION 1: The Firm is engaged in the business of providing temporary technical services to its clients. The Firm maintains a roster of workers who are available to provide technical services to prospective clients. The Firm does not train the workers but determines the services that the workers are qualified to perform based on information submitted by the workers.
>
> The Firm has entered into a contract with the Client. The contract states that the Firm is to provide the Client with workers to perform computer programming services meeting specified qualifications for a particular project. The Individual, a computer programmer, enters into a contract with the Firm to perform services as a computer programmer for the Client's project, which is expected to last less than one year. . . [The Individual has not previously provided services for either the Firm or the Client.] The Individual's contract with the Firm states that the Individual is an independent contractor with respect to services performed on behalf of the Firm for the Client.
>
> . . . During the time the Individual is performing services for the Client, even though the Individual retains the right to perform services for other persons, substantially all of the Individual's working time is devoted to performing services for the Client. A significant portion of the services are performed on the Client's premises. The Individual reports to the Firm by accounting for time worked and describing the progress of the work. The Firm pays the Individual and regularly charges the Client for the services performed by the Individual. The Firm generally does not pay individuals who perform services for the Client unless the Firm provided such individuals to the Client.
>
> The work of the Individual and other programmers is regularly reviewed by the Firm. The review is based primarily on reports by the Client about the performance of these workers. Under the contract between the Individual and the Firm, the Firm may terminate its relationship with the Individual if the review shows that he or she is failing to perform the services contracted for by the Client. Also, the Firm will replace the Individual who another worker if the Individual's services are unacceptable to the Client.

> In such a case, however, the Individual will nevertheless receive his or her hourly pay for the work completed.
>
> Finally, under the contract between the Individual and the Firm, the Individual is prohibited from performing services directly for the Client and, under the contract between the Firm and the Client, the Client is prohibited from receiving services from the Individual for a period of three months following the termination [of] services by the Individual for the Client on behalf of the Firm.

*Id.* After reciting the 20 factors, the I.R.S. analyzed the described hypothetical. It noted that "[t]he Firm retains the right of control to insure that the services are performed in a satisfactory fashion. The fact that the Client may also exercise some degree of control over the individual does not indicate that the Individual is not an employee." *Id.* The I.R.S. concluded that, in such a situation, "[t]he Individual is an employee of the Firm under the common law rules." *Id.*

For all practical purposes, the situation described in the Revenue Ruling is indistinguishable from the arrangement between Columbine, the nurses, and the hospitals.[7] The only notable difference between facts in the hypothetical and the facts of this case is that, unlike "the Firm," Columbine expressly instructed its nurses that they were its employees, not independent contractors. If anything, this distinction only pushes Columbine's situation even more decisively into the employer-employee camp.

### 2. Knowledge of False Statements in 941s

Next, Mr. Crabbe challenges the sufficiency of the evidence underlying Counts 29-34, false statements on the 941s. To establish a violation of 26 U.S.C. § 7206(1), the Government

---

[7]Curiously, Mr. Crabbe cites to Revenue Ruling 87-41 for the proposition that none of the 20 listed factors is controlling, *Docket* # 208 at 7-8, but makes no mention of the stark similarities between the factual situation described in that ruling and the facts of this case, much less offers any argument as to why this Court should reach a conclusion in conflict with the Ruling.

must show that Mr. Crabbe had willfully filed a false tax return, and that he did so knowing that the contents of that return were inaccurate.  *See e.g U.S. v. Pomponio*, 429 U.S. 10, 13 (1976); *U.S. v. Greene*, 239 Fed.Appx. 431, 437 (10th Cir. 2007) (unpublished) (reciting elements).

Mr. Crabbe argues that the Government failed to adequately prove his knowledge that the 941s he filed were false.  Mr. Crabbe explains that in acquitting him of Counts 23-28 –which relate to the 941s from Q1 1999 through Q2 2000 – the jury must have "found that Mr. Crabbe did not sign those returns with the essential knowledge that they were false."  From this, Mr. Crabbe contends that because the Q3 2000 941 at issue in Count 29 was signed on June 1, 2001, only 8 days later, the jury must necessarily have found that Mr. Crabbe acquired knowledge of the falsity of the 941s sometime within this 8-day period.  Mr. Crabbe goes on the argue that there are no events within this 8-day period that could reasonably be viewed as having alerted him to the falsity of the 941s he was signing.

Mr. Crabbe's argument springs from two false premises.  First, and perhaps most fundamentally, it presumes that one can divine the jury's findings as to particular elements simply by examining the pattern of convictions and acquittals.  To do so requires an assumption that a jury's verdicts will always reflect an apparently disciplined analysis of the evidence. However, as Supreme Court jurisprudence concerning logically-inconsistent verdicts aptly demonstrates, such an assumption is unwarranted.

In *Dunn v. U.S.*, 284 U.S. 390, 393 (1932), the Court refused to find a jury's logically-inconsistent verdict on related counts to be grounds to set aside that portion of the verdict convicting the defendant.  "The most that can be said in such cases," explained the Court, "is that the verdict shows that either in the acquittal or the conviction the jury did not speak their real

conclusions, but that does not show that they were not convinced of the defendant's guilt." *Id.* The *Dunn* Court stated that they would interpret the defendant's acquittal "as no more than [the jury's] assumption of a power which they had no right to exercise, but to which they were disposed through lenity." *Id.* In other words, a jury's acquittal cannot necessarily be interpreted to mean that the jury has found the proof lacking on a particular count; it is entirely possible that the jury has found the defendant guilty but has decided to exercise its prerogative of jury nullification. In repeatedly reaffirming the reasoning of *Dunn*, the Supreme Court has declined to offer relief to either party subjected to an inconsistent verdict, as "[i]nconsistent verdicts therefore present a situation where 'error,' in the sense that the jury has not followed the court's instructions, most certainly has occurred, but it is unclear whose ox has been gored." *U.S. v. Powell*, 469 U.S. 57, 65 (1984).

Although this case does not involve a verdict that is logically-inconsistent, the Supreme Court's tolerance of inconsistent verdicts discourages courts from attempting to divine the factual conclusions reached by the jury by comparing acquittals and convictions on various counts. Such restraint is appropriate, as there could be several explanations for the pattern of convictions and acquittals here:

> • Arguably, as Mr. Crabbe contends, the jury might have found that he had no idea that the 941s up through May 21, 2001 falsely omitted the nurse payroll, and that between May 21 and June 1, 2001, he achieved an unexplained moment of satori and, thereafter, knew that the 941s he was filing were false.

> • The jury could have believed that Mr. Crabbe had limited involvement in and knowledge of Columbine's operations until mid-2000, when he actively began involving himself in the company with his "check register" project. The jury might have inferred from the evidence that, until mid-2000, Mr. Crabbe may not have had a full understanding of Columbine's policies with regard to nurses, and thus, may not have known whether or not the nurses could be considered Columbine's employees during those periods. As a result, the jury may have found that the 941s Mr. Crabbe filed for

23

these periods were not knowingly false.  However, in light of his more extensive involvement with the business beginning in mid-2000, the jury may have concluded that Mr. Crabbe would have come to more fully understand that Columbine was legally responsible for the nurses, and thus, that he knew that the 941s that he filed for Q3 2000 and beyond were false.[8]

• The jury may have concluded that Mr. Crabbe knew that <u>all</u> of the 941s he filed were false, but, in light of the evidence that Mr. Rowan was primarily responsible for many of Columbine's improper business practices, and therefore chose to acquit Mr. Crabbe of some counts.  The jury may have decided to acquit Mr. Crabbe on half the false reporting counts, reflecting his roughly 50% ownership in Columbine.  The jury may have chosen to register those acquittals on the chronologically-earliest counts, to reflect for Mr. Crabbe's progressively-greater involvement with the business.

Because it is impossible to reliably reconstruct the jury's conclusions from the pattern of their verdict, the Court is particularly skeptical of an argument that is premised upon a belief that the jury must necessarily have "found" a certain fact to occur as of a certain date and declines to assume that the jury must necessarily have found that Mr. Crabbe learned of the falsity of his filings as of any particular moment in time.

Secondly, Mr. Crabbe's argument takes a needlessly narrow view of Counts 29-34.  Mr. Crabbe is correct that Count 29 involves on a 941 filed on June 1, 2001, only a few days after he filed a number of similar 941s for which the jury acquitted him.  But Count 30 involves the Q4 2000 941 that was signed on June 15, 2001, more than two weeks after that.  On June 12, 2001, only days before signing the Q4 2000 941 – which disclosed a quarterly payroll of approximately $ 211,000 – Mr. Crabbe signed a State Unemployment Insurance Tax Report covering that same period, in which Columbine had declared a quarterly payroll almost 25%

_____

[8]Alternatively, the jury may have concluded that mid-2000 (or perhaps late-May 2001) was the date upon which Mr. Crabbe asked Mr. Hoover and Dean Fox about whether the nurses could be treated as independent contractors, rather than employees.  Mr. Fox and Mr. Hoover responded that they could not, a fact that Mr. Crabbe testified that he accepted as being accurate.

larger. The jury could very easily have concluded that the Unemployment Report put Mr. Crabbe on notice that the Q4 2000 941 was false, thereby supporting the verdict of guilt on Count 30. The 941s underlying Counts 32, 33, and 34 expressly assert that Columbine had only 20-30 employees per quarter, yet there was evidence that Mr. Crabbe knew at the time that Columbine's workforce of nurses numbered in the hundreds. Mr. Crabbe's argument on this point might cast doubt upon the jury's verdict of guilt on Count 29,[9] but it does not assist Mr. Crabbe in attacking any of the other false reporting counts.

　　　　3. Willfulness

Finally, Mr. Crabbe argues for acquittal on Counts 2-11, the failure to remit counts. 26 U.S.C. § 7202 provides that "any person required under this title to collect, account for, and pay over any tax imposed by this title who willfully fails to collect or truthfully account for and pay over such tax" shall be guilty of a crime. Mr. Crabbe contends that there was inadequate evidence to establish that his failure to pay over the funds withheld by Columbine was "willful."

The jury was instructed that:

> 　A corporation can only act through the actions of its officers, directors, and employees. Every corporation that has employees must have at least one officer, director, or employee responsible to carry out that corporation's legal duty to collect, account for, and pay over employment taxes. There may be more than one person in a corporation with this responsibility.
>
> 　An individual is responsible for the collection, accounting, and paying of employment taxes for a corporation if that person had the status, authority, and duty to assure that the taxes are properly withheld and paid over to the Internal Revenue Service. A responsible person will have significant control over the general

<hr />

[9]For the reasons stated above, the Court rejects Mr. Crabbe's argument as it applies to Count 29, and declines to enter judgment of acquittal on that Count.

management and financial decision-making process within the corporation, such that he would have the power and authority to determine whether and how much an employee will be paid, even if that person does not personally prepare payroll records or issue payroll checks. Among the factors that you should consider in determining whether Mr. Crabbe was a person responsible for Columbine Healthcare Systems, Inc.'s duty to collect and pay over employment taxes are the extent to which Mr. Crabbe held a corporate office, controlled the corporation's financial affairs, had the authority to distribute corporate funds, held stock in the corporation, and had the ability to hire and fire employees. No one factor is determinative, and you should consider these factors in light of the evidence as a whole.

Mr. Crabbe's argument on this point is somewhat curious. He contends that there was no evidence that "Mr. Crabbe knew that he, personally (as opposed to the corporate taxpayer, Columbine), had a duty to collect, account for and pay over Columbine's withheld employment taxes." *Docket* # 208 at 26. He concedes that the Government's evidence "may have allowed the jury to conclude that Mr. Crabbe knew that he had the <u>authority</u> to account for and pay Columbine's taxes, [but] it is not sufficient to infer that Mr. Crabbe <u>knew</u> that he had a <u>personal duty</u> to do so." *Id.* at 29 (emphasis added). The Court understands Mr. Crabbe to be arguing that, as a matter of law, an individual who willfully fails to exercise his <u>corporate</u> authority to collect and remit employee withholdings cannot be convicted under § 7202 unless the Government shows that the individual also had (and knew of) some sort of <u>personal</u> responsibility, independent from his corporate position, to remit the monies.

Mr. Crabbe cites no authority for this proposition and by all appearances, this is an incorrect assessment of the law. 26 U.S.C. § 7202 was "designed to assume compliance by the employer with its obligation to withhold and pay the sums withheld, <u>by subjecting the employer's officials</u> responsible for the employer's decisions regarding withholding and

payment to civil and criminal penalties for the employer's delinquency." *Slodov v. U.S.*, 436 U.S. 238, 247 (1978) (emphasis added). Although the Court was ultimately construing 26 U.S.C. § 6672, a companion statute creating civil penalties for corporate officials that fail to remit withheld taxes, it clearly viewed § 6672 and § 7202 to operate with a common goal. *Id.* at 238. Thus, when the Court characterizes the congressional purpose of § 6672 to "[make] corporate officers personally liable for the corporation's tax obligations" involving withheld monies, *id.* (emphasis added), that same logic warrants the conclusion that, contrary to Mr. Crabbe's unsupported argument, § 7202's very purpose is to create personal criminal liability for corporate officers who fail to carry out their corporate duty to remit withheld funds.

The two key elements of the § 7202 counts required the Government to prove that Mr. Crabbe was a person responsible for Columbine's collection, accounting for, and paying over employee tax withholdings; and that Mr. Crabbe "knew that he was legally required to collect, account for, and pay over such taxes and that he acted with the intent to violate that legal duty." *Concluding Instruction No. 16*; *see e.g. U.S. v. Pflum*, 150 Fed.Appx. 840, 842 (10th Cir. 2005) (unpublished). As Mr. Crabbe concedes, there was evidence that he was one of the Columbine officials responsible for collecting, accounting for, and paying over withheld funds. Among other things, the evidence establishes that he was an owner and officer of Columbine; that he signed payroll checks, on which employee tax withholdings were conspicuously identified; that he was largely in control of a bank account that was ostensibly set up for the primary purpose of holding and paying out withheld tax monies; that he had discussions with and gave instructions to other Columbine employees about reports of problems with employee withholdings not being credited to employees' tax and Social Security records; that he personally insisted upon

Columbine attempting to stay current on its employment tax liabilities; and that he personally prepared a number of Columbine's 941s, the means by which Columbine was supposed to remit the withheld funds to the I.R.S.

Moreover, there is also evidence that Mr. Crabbe's failure to ensure that the withheld funds were accounted for and paid over was knowing and willful. Mr. Crabbe's <u>knowledge</u> of Columbine's obligation to collect and remit employment taxes is best expemplified by his insistence in conversations with Mr. Carlson and Mr. Rowan that the company attempt to stay current on its taxes, and later, by the fact that Mr. Crabbe personally prepared the 941 forms that were supposed to advise the I.R.S. of the taxes being remitted. In addition, there was evidence that Mr. Crabbe was bothered by the company's mounting tax delinquencies, such that he sought to retain a tax attorney to assist the company.

The evidence that Mr. Crabbe <u>willfully</u> refused to carry out his obligations to remit the withheld monies is more circumstantial, but still sufficient. There was evidence that Mr. Crabbe had expressed a desire to structure the business so that no employment taxes would have to be paid for the nurses; that he was aware of the company's mounting unpaid employment tax liabilities and that he took only occasional and mostly ineffectual steps to address those liabilities; that he was advised of complaints by Columbine employees that their taxes were not properly being credited and failed to take affirmative action to ensure that proper reporting and remittance occurred; that he filed 941s that falsely omitted the nurses' payroll and, for the reasons stated previously, did so knowing that the forms were false and did not fully reflect Columbine's payroll obligations; and that after learning of his error in omitting the nurses from the 941s he filed, he waited more than a year and a half to file corrected forms and remit the

nurses' withholdings, and did so only after learning that a criminal investigation was targeting him. This and other evidence is sufficient to permit the jury to infer that Mr. Crabbe's failure to carry out his corporate obligation to remit withheld funds was willful.

Accordingly, Mr. Crabbe's Motion for Judgment of Acquittal is denied in all respects.[10]

**B. Motion for New Trial**

Fed. R. Crim. P. 33 permits the Court to grant a new trial "if the interest of justice so requires." In adjudicating the Motion for New Trial, the Court does not defer to the Government's version of the evidence; rather, it sits "as a thirteenth juror" and independently considers the credibility of the witnesses and weighs the evidence. *U.S. v. Lopez*, 576 F.2d 840, 845 (10th Cir. 1978). Relief in the form of a new trial is disfavored and should be granted only with great caution. *U.S. v. Miller*, 987 F.2d 1462, 1466 (10th Cir. 1993). If the weight of the evidence is so contrary to the jury's verdict that the verdict would amount to a miscarriage of justice, relief in the form of a new trial may be appropriate. *U.S. v. Gabaldon*, 91 F.2d 91, 93-94 (10th Cir. 1996). However, such relief should only be afforded "in exceptional cases" where the evidence "preponderates heavily" against the verdict, *U.S. v. Evans*, 42 F.3d 586, 593-94 (10th Cir. 1994), or where there has been one or more trial errors that, taken in the context of the entire case, prejudiced Mr. Crabbe. *Gabaldon*, 91 F.3d at 94. .

1. Material misrepresentation in closing argument

Mr. Crabbe's first argument is that the Government made a material misrepresentation in its closing argument. In its argument, the Government stated, "to the employees of Columbine

---

[10]To the extent that the Court has not specifically addressed other arguments raised by Mr. Crabbe's motion, the Court has considered those arguments and finds them to be without merit.

who counted on, trusted, and believed that this matter was being taken care of, it was another story. <u>They had been burned</u>. They had [been] shortchanged. That's what this case is about." (Emphasis added).

Mr. Crabbe contends that the "burned" language was misleading, insofar as, by operation of law, an employee is granted credit for taxes that were withheld from the employee's pay, even if the employer never makes a proper remittance of the withheld funds. As a result, Mr. Crabbe argues, the failure to remit the nurses' withholdings did not deprive the nurses of full credit for the taxes that were withheld. Thus, Mr. Crabbe contends, the Government's argument that the nurses were "burned" was materially misleading, warranting a new trial. In response, the Government argues that the reference to nurses being "burned" and "shortchanged" was a "fair comment on the evidence." The Government contends that the evidence shows that Mr. Crabbe paid himself hundreds of thousand dollars in profit while failing to remit several million dollars in withheld taxes; that employees had testified to feeling wronged and cheated; and that, despite being made whole by operation of law, employees suffered "emotional angst, frustration, and betrayal" over Columbine's actions. In addition, the Government notes that Mr. Crabbe did not contemporaneously object to any portion of the Government's closing argument.

A party's failure to make a contemporaneous objection to an allegedly improper comment during a closing argument requires this Court to undertake a "plain error" review, warranting relief only if the comment "seriously affects the fairness, integrity, or public reputation of judicial proceedings." *U.S. v. Hernandez*, 327 F.3d 1110, 1114 (10th Cir. 2003). Under Fed. R. Crim. P. 52(b), the burden is on Mr. Crabbe to show that the remark was prejudicial. *U.S. v. Olano*, 507 U.S. 725, 734-35 (1993).

For several reasons, the Court is not persuaded that the remark was so prejudicial that it affected the fairness, integrity, or public reputation of the proceedings. First, the Court observes that, rather than being an assertion of a specific fact, the challenged comment is an ambiguously-stated characterization of an unspecified situation. The preceding portions of the Government's closing referred to nurses who "believed that their employer . . . were honestly and properly taking out their withholdings and payroll taxes and paying it over to the Government." *Docket #* 221 at p. 2189. The Government also referred to other employees who "trusted that the wages that they had earned . . . were going to be properly paid over to the Government," and who "counted on Mr. Crabbe and his company to make sure that . . . these moneys would be credited and paid over to the Government. That's what they counted on." *Id.* In this context, the Government's unspecific contention that the employees were "burned" (and even that they were "shortchanged") could reasonably be construed to mean that the employees suffered a permanent financial loss, as Mr. Crabbe contends, but could also be reasonably understood to reflect the betrayal of the employees' beliefs and reposed trust by Mr. Crabbe's appropriation of funds belonging to either the Government or the nurses for his own personal use. Another equally plausible interpretation of the Government's comment is that the nurses were "burned," not in the sense that they would never receive credit for the unremitted withholdings, but in the sense that Columbine's failures caused them distress and aggravation, and forced them to embark upon a long and burdensome bureaucratic process of phone calls, record gathering, and office visits, all on their own time, in an attempt to retrieve that which they had entrusted to Columbine.

Even assuming that Mr. Crabbe is correct, and the Government's "burned" comment in closing was <u>potentially</u> misleading, the Court discerns no actual prejudice. One cannot read the

jury's split verdict as reflecting passions that had been unduly inflamed against Mr. Crabbe. To the contrary, the jury acquitted Mr. Crabbe of the tax evasion count involving his personal tax return, as well as on counts relating to actions taken by Columbine in 1999 and early 2000. Whether one interprets those acquittals as the jury carefully weighing the evidence and finding the Government's proof wanting, or the jury's indulgence in a form of leniency, the fact remains that the Government's allegedly prejudicial comments failed to sway the jury on these counts. It is difficult to harmonize a contention that the Government bamboozled the jury with false assertions of permanent injury to the employees with the jury's verdict that acquitted Mr. Crabbe on some of the failure to remit and false reporting charges.

Accordingly, no new trial is warranted on this ground.

2. Sufficiency of evidence

Mr. Crabbe raises several arguments in support of his motion for a new trial that tread the same ground as those raised in his Motion for Judgment of Acquittal – namely, that there was insufficient evidence to support findings that the nurses were Columbine's employees, that Mr. Crabbe knew the 941s he filed were false, and that Mr. Crabbe's failure to remit withheld funds was willful.

As discussed above, where a new trial is sought based on the alleged insufficiency of the evidence, the Court may independently weigh the evidence and evaluate the credibility of the witnesses, but the jury's verdict should be allowed to stand "unless the evidence weighs heavily enough against the verdict . . . [such] that a miscarriage of justice may have occurred." *U.S. v. Sturdivant*, 513 F.3d 795, 802 (8th Cir. 2008).

Even if the Court were to consider the evidence at trial anew, disregarding the jury's findings, it cannot say that the weight of the evidence so favors Mr. Crabbe that a verdict to the contrary would be a miscarriage of justice. Indeed, the bulk of the facts in this case were not actually contested, and the parties' dispute turned largely on how one interpreted those facts and drew inferences from them.[11] Distilled to its essence, Mr. Crabbe's argument on this issue repeats his general defense theory: that Mr. Rowan directed and was responsible for most of Columbine's misconduct; and that once he became actively involved with Columbine's business, Mr. Crabbe innocently ran afoul of tax reporting and remittance requirements out of ignorance and carelessness.

The Court will not belabor the discussion by addressing each of Mr. Crabbe's contentions point-by-point. It is sufficient to acknowledge that it was abundantly clear that Mr. Rowan was dictatorial, abusive, and unfamiliar with (or unwilling to follow) business protocols and legal requirements. It was also clear that, at least to a point, Mr. Crabbe was marginalized within Columbine and had little control over corporate decisions. However, there was significant evidence that Mr. Crabbe did not remain a helpless and passive observer throughout the company's lifespan. Mr. Crabbe, a trained and practicing psychologist familiar with abusive behavior, was aware of Mr. Rowan's controlling personality and questionable business practices since the early days of their business association. Although he considered disassociating himself from Mr. Rowan, he instead not only continued to do business with Mr. Rowan through Columbine, but also shared ownership with Mr. Rowan in many other business ventures and

---

[11]For essentially the same reasons stated in the discussion of the Motion for Judgment of Acquittal with regard to the status of nurses as employees, the Court finds no merit in Mr. Crabbe's contention that a new trial is warranted with regard to the jury's verdict on that issue.

socialized and vacationed with Mr. Rowan during the time period at issue.  By 2000, Mr. Crabbe was specifically concerned about financial mismanagement of Columbine by Mr. Rowan and had completed the lengthy and ambitious "check register" project, which allowed him to familiarize himself the company's particular revenues and expenditures.  In that same period of time, he conspired with Mr. Carlson to open the Bank One account and to issue a large number of checks on that account, while concealing, as much as possible, its corpus from Mr. Rowan, admittedly for both business (*i.e.* payment of taxes) and personal (*i.e.* concealing corporate funds from Mr. Rowan's profit-taking) reasons.  There was significant evidence that indicated that Mr. Crabbe was aware of and troubled by Columbine's large and growing payroll tax delinquency, but also that he personally withdrew hundreds of thousands of dollars in profit from Columbine.

Because the basic operative facts were not in dispute – Columbine did not remit the withheld funds and the 941s filed by Mr. Crabbe were objectively false – the core dispute involved Mr. Crabbe's knowledge and intent.  The jury heard testimony by Mr. Rowan and Mr. Crabbe, giving them ample opportunity to assess the credibility of each.   The evidence strongly implied that Mr. Crabbe was well aware of the payroll tax burden posed by the nurses, and actively sought to find ways to evade it – *e.g.* by characterizing them as independent contractors.  Mr. Crabbe's own testimony on this point corroborated that this was his desire, and that he only reluctantly accepted the reality that doing so was not possible.  That Mr. Crabbe's ommission of the nurses from the 941s conveniently accomplished exactly the same goal calls the credibility of his self-professed ignorance and mistake into doubt.

The manner in which Mr. Crabbe went about preparing the 941s also cast a shadow over Mr. Crabbe's innocent explanation of events.  Embarking upon a plan to make good on several

years of unpaid taxes, Mr. Crabbe did not first sit down with Mr. Hoover to determine the precise amount of taxes owed; consult with Ms. Deutsch, the tax attorney he specifically sought to retain with regard to the problem; meet with the corporate employees ostensibly responsible for preparing and filing the 941s; or consult with the I.R.S. to determine when the company's delinquency began. Rather, according to Mr. Crabbe, he arbitrarily selected a date and began preparing 941s, seeking guidance only from Mr. Rowan, the man whose business acumen, judgment, and ethics he distrusted.

Finally, Mr. Crabbe's conduct after discovering the 941s were false could be viewed as inconsistent with the defense's characterization of Mr. Crabbe as dedicated to ensuring that Columbine's tax obligations would be fully honored. It appears that Mr. Crabbe learned as early as October 2000 that the 941s he had filed were false, yet more than a year and a half before any amended returns were filed. Mr. Crabbe's own testimony was that he undertook no efforts to investigate and resolve the issue, and abandoned the task to Mr. Hoover and one of Columbine's corporate employees. Mr. Crabbe admits that he knew that little progress was being made on the amended returns, and yet, nothing in the record indicates that he expressed any anxiety about the problem, nor otherwise manifested the principles of honesty and integrity that he claimed to possess. Indeed, the sequence of events suggests that, notwithstanding Mr. Crabbe's professed desire to make good on Columbine's taxes, the event that finally triggered the filing of the corrected returns was the discovery that a criminal tax investigation of the company was underway.

These, and many other facts in the record, could cumulatively justify an inference by the jury that Mr. Crabbe intentionally understated Columbine's payroll and, rather than remitting the

funds withheld from its employees' paychecks to the I.R.S., withdrew substantial amounts from Columbine as "profit." The evidence is susceptible to a reasonable interpretation that this was consistent with Mr. Crabbe's expressed desire to avoid payroll tax liability for the nurses, even though he was conclusively advised by others that Columbine was responsible for the nurses' taxes. The Court cannot say that the weight of the evidence so overwhelmingly favors Mr. Crabbe that the jury's verdict could be deemed a miscarriage of justice, and thus, the Motion for New Trial based on the weight of the evidence is denied.

3. <u>Inability to put on a complete defense</u>

The final ground upon which Mr. Crabbe seeks a new trial is a contention that various rulings by the Court prevented him from putting on a complete defense. The Court will address each of these contentions individually.

(i) Control of Columbine's corporate predecessor

Mr. Crabbe contends that the Court erred in refusing to let him present the testimony by deposition of John Wooster, a former employee of Columbine's corporate predecessor, Quality Home Medical Group, Inc.

At the outset, the Court notes that Mr. Crabbe's motion does not specifically identify any ruling by the Court that excluded Mr. Wooster's testimony. Prior to trial, the Government sought to exclude Mr. Wooster's testimony in a motion *in limine* **(# 171)**, on the grounds that Mr. Wooster's testimony related to a time period preceding the dates encompassed by the Indictment, and thus, was unduly prejudicial under Fed. R. Evid. 401 and 403. The Government also argued that the evidence's focus was prior bad acts by Mr. Rowan, in violation of Fed. R. Evid. 404. The Court reserved ruling on this motion at the Final Pretrial Conference **(# 174)** and

stated that it would consider the motion at the time of trial. On the first day of trial, prior to the commencement of *voir dire*, the Court noted that the motion remained pending and stated that "I will not be ruling on that at this time, either." *Docket # 212 at 6*. The Court instructed the parties that, to the extent that there is a dispute as to the admissibility of Mr. Wooster's evidence, the parties simply could not refer to the disputed evidence <u>during their opening statements</u>. *Id.* at 6, 7. It was clear to all involved that the Court had reserved ruling on the admissibility of Mr. Wooster's testimony until such time as it was offered. However, throughout the remainder of the trial, Mr. Crabbe never requested to present Mr. Wooster's testimony, nor otherwise requested that the Court affirmatively rule on the Government's motion.

As a consequence, the Court is unable to find that it prevented Mr. Crabbe from putting on a complete defense; the decision not to call Mr. Wooster was apparently made voluntarily by Mr. Crabbe. To the extent Mr. Crabbe argues that his inability to refer to Mr. Wooster's testimony in his opening argument was somehow so prejudicial that it made it impractical to attempt to call Mr. Wooster as a witness later, that argument is patently meritless. The testimony apparently sought to be elicited from Mr. Wooster – that Mr. Rowan was abusive, controlling, and managerially irresponsible in a prior corporate endeavor that was no longer in existence as of the dates in the Indictment – was needlessly cumulative of the wealth of evidence regarding Mr. Rowan's managerial and personal behavior that was received at trial, if not completely irrelevant and otherwise barred by Fed. R. Evid. 404. Mr. Crabbe's decision not to present Mr. Wooster as a result of the Court's ruling regarding opening statements did not deprive him of the opportunity to mount an effective defense, and does not warrant a new trial.

(ii) Mrs. Crabbe

Mr. Crabbe argues that his defense was also impeded by the Court's refusal to delay the trial to permit Mr. Crabbe's wife to testify before Mr. Crabbe.

The facts involving this issue arose on the seventh day of trial, at which time the defense was in the midst of presenting its case. At approximately 2:20 p.m., the defense had just finished its direct examination of Mr. Hoover, and the Court took its afternoon recess before the Government began its cross-examination. *Docket* # 218 at p. 1637. When the trial resumed at approximately 2:45 p.m., defense counsel informed the Court that Mr. Hoover was "our last witness for the day." Counsel explained that he thought that Mr. Hoover's testimony would take longer, but that he did not have any other witness present. *Id.* at 1638. The Court inquired as to what witnesses the defense had left to call, and was informed that they intended to call Mr. Crabbe, Mrs. Crabbe, and possibly an unspecified third witness. *Id.* The Court observed that Mr. Crabbe was present and could begin testifying, but defense counsel explained that "I'm not ready to put him on yet." *Id.* at 1639. The Court advised defense counsel that "it is necessary to have witnesses for the full time allotted for trial. And so if there is someone else you can get here to fill in the time, please do so." *Id.* Defense counsel apologized, and Mr. Hoover's testimony resumed. (The record does not reflect whether defense co-counsel, Mr. Crabbe, or anyone else thereafter left the courtroom to attempt to contact witnesses.)

The minutes from trial Day 7 indicate that Mr. Hoover testified until approximately 3:58 p.m., approximately one hour and fifteen minutes after the preceding colloquy. *Docket* # 192. At the conclusion of Mr. Hoover's testimony, the Court called counsel to the bench, and inquired whether the defense was prepared to call another witness. *Docket* # 218 at 1700. Defense counsel responded that he was not. *Id.* at 1700-01. The Court inquired why counsel could not

38

proceed to call Mr. Crabbe, who was present, and defense counsel stated that "I wanted to introduce him through his wife and have her testify." *Id.* at 1701. The Court inquired as to how calling Mr. Crabbe now would be prejudicial, and defense counsel responded that "I haven't had a chance to go through a couple topics with him that I need to discuss with him." *Id.* at 1702. The Court observed that the defense could delay moving into those areas until a later point in time, and defense counsel agreed. *Id.* Then, Mr. Crabbe took the stand.

Mr. Crabbe testified the remainder of the day, mostly about his personal and family history, his prior work experience, and the circumstances that led him to consider going into business with Mr. Rowan. *Id.* at 1702-1741. The following day, Mr. Crabbe re-took the stand and continued his testimony. At no time did the defense request leave to suspend Mr. Crabbe's testimony to present Mrs. Crabbe, nor did it seek to present Mrs. Crabbe's testimony after Mr. Crabbe's. Instead, the defense rested at the conclusion of Mr. Crabbe's testimony.

In the instant motion, Mr. Crabbe contends that being forced to present his testimony before that of his wife was so prejudicial as to warrant a new trial. According to Mr. Crabbe, the prejudicial effect is that Mrs. Crabbe would have testified that, on a number of occasions, she had observed that her husband was forgetful and lacked focus as to details of projects. Mr. Crabbe contends that it was "critically important" that this testimony precede Mr. Crabbe's testimony, such that it would "lay a backdrop against which Mr. Crabbe's testimony concerning these events would, in the eyes of the jury, seem more understandable." Mr. Crabbe further explains that once he was called to testify, "the opportunity to achieve this intended impact was irretrievably lost."

Although the Court appreciates the defense's trial strategy, it is unconvinced that the defense's inability to fully deploy that strategy resulted in prejudice that would warrant a new trial. Mr. Crabbe acknowledges that the Court necessarily possesses considerable discretion in controlling the orderly presentation of evidence, and may limit or exclude the presentation of even relevant evidence in order to promote the efficient administration of the judicial process. *Thweatt v. Ontko*, 814 F.2d 1466, 1470 (10th Cir. 1987). Although the Constitution entitles Mr. Crabbe to the right to present witnesses in his defense, that right is balanced against the Court's interest in maintaining control over the timing of witnesses' testimony. *See Noble v. Kelly*, 246 F.3d 93, 99 (2d Cir. 2001). Here, Mr. Crabbe's Sixth Amendment rights were not infringed. The Court did not prevent Mrs. Crabbe from testifying; the Court simply declined to recess midafternoon at Mr. Crabbe's convenience, and instead directed that Mr. Crabbe be prepared to put on a witness once Mr. Hoover's testimony finished. Mr. Crabbe had a variety of ways in which that command could be honored without compromising his defense.

He could have made arrangements to have Mrs. Crabbe (or any other anticipated witness) come to the courthouse while Mr. Hoover's testimony continued. It should have been apparent to defense counsel by roughly noon of that day that the defense case was proceeding expeditiously and that additional witnesses for the day would be needed. But assuming that defense counsel only recognized the problem at the time of the afternoon recess at 2:20 p.m., a phone call to Mrs. Crabbe or another witness might have assured their presence.[12]

_____

[12]For example, more than 90 minutes passed between the Court's recess at 2:20 p.m. and the conclusion of Mr. Hoover's testimony at 3:58 p.m. Assuming Mrs. Crabbe was at the Crabbes' residence in Kersey, Colorado at the time, a phone call to her at 2:20 p.m. would have allowed her to leave home and reach the courthouse long before Mr. Hoover finished testifying. According to www.mapquest.com, the distance between the Crabbes' residence and the

Alternatively, the defense could have interrupted Mr. Crabbe's testimony at the beginning of Day 8 of trial and requested to call Mrs. Crabbe at that point. Given that Mr. Crabbe offered no significant substantive testimony during the hour that he testified on Day 7 of the trial – and certainly no testimony relating to specific events that would be elucidated by his alleged forgetfulness and inattention to detail – one can hardly say that the persuasiveness of Mrs. Crabbe's testimony would have been lost. Nor could it have been unduly disruptive to the flow of Mr. Crabbe's testimony to interrupt it at that time.

Mr. Crabbe could also have chosen to call Mrs. Crabbe after he completed his own testimony. The persuasiveness of Mrs. Crabbe's testimony, as described by Mr. Crabbe's motion, was not lost simply because Mr. Crabbe testified first. Mrs. Crabbe's testimony would have been in the nature of character evidence, describing Mr. Crabbe's inherent traits. It is not clear how such testimony is less pertinent because it comes after Mr. Crabbe has already testified, and beyond the conclusory assertion that the value of Mrs. Crabbe's testimony was "irretrievably lost," Mr. Crabbe does not explain how the sequencing of testimony particularly impaired the persuasive value of Mrs. Crabbe.[13] In reply, Mr. Crabbe suggests that "certain aspects of Mr. Crabbe's testimony might not be easily understood by the jury," and that "the jury . . . made its initial determinations about [the crediblity of] Mr. Crabbe" without having had the

---

courthouse in Denver is approximately 54 miles, with an estimated driving time of 59 minutes.

[13]The Court notes that, at the time, defense counsel did not state that he believed that Mrs. Crabbe's testimony would be rendered ineffectual if she were called out of the defense's intended order. When asked how proceeding to call Mr. Crabbe would be prejudicial, defense counsel stated only that he had not had an opportunity to discuss certain matters with him – and presumably, did not inquire into those matters during Mr. Crabbe's testimony on the remainder of Day 7.

opportunity to hear Mrs. Crabbe's testimony about his "absentmindedness and unwavering commitments to truth, integrity, and kindness." The Court merely notes that there is nothing that Mr. Crabbe testified to that was particularly difficult for the jury to understand, such that Mrs. Crabbe's proposed testimony would have been necessary to clarify it. In addition, the jury was instructed at the beginning of the case that "because you will only hear one witness at a time, you should wait until you have heard all of the evidence before you make up your mind as to whether to believe the testimony of any witness and before you decide about the existence of any particular fact." *Docket* # 213 at p. 143. The Court assumes that the jury follows the instructions it is given. Based upon that assumption, the Court cannot speculated that the defense's unintended sequencing of the witnesses was prejudicial to Mr. Crabbe.

Although Mr. Crabbe's trial strategy was upset by the Court's declination to recess early on Day 7, the Court does not find that Mr. Crabbe was denied the opportunity to call Mrs. Crabbe, nor that any delay in presenting her testimony created prejudice warranting a new trial.

### (iii) Failure to compel subpoenaed documents

Finally, Mr. Crabbe argues that his ability to present a defense was impeded by the Court's failure to compel the Government to produce various tax returns subpoenaed by the defense for entities other than Columbine, and the Court's failure to compel the Government to produce an investigative file created by Revenue Agent Pat Korb in conjunction with a 1998 effort to collect taxes owed by Columbine. At trial, Mr. Crabbe requested either a mistrial or a continuance until the Government produced the requested information.

The Court heard extensive argument on this issue during trial, *Docket* # 218 at p. 1515-1537, compelled production of all documents that could be located on such short notice,[14] and issued a comprehensive ruling, *id.* at 1537-1546, finding that Ms. Korb's file would merely have been cumulative of other evidence already received, *id.* at 1541; that the Government had produced or accounted for between 75% and 99% of the tax information for the other entities, and that any missing material was needlessly cumulative, *id.* at 1544-45; and that, after the Government's production of the existing documents, a continuance was unnecessary because Mr. Crabbe had 2½ business days (plus an intervening weekend) to review and evaluate the information that the Government had produced before the trial was scheduled to resume. *Id.* at 1545.

Mr. Crabbe's Motion for New Trial does not present any new or significantly different arguments than were presented at trial, and thus, the Court rests on its prior ruling. In summary, the Court finds that all of the requested information was sought for the purpose of establishing that Mr. Rowan was the primary manager of Columbine as of 1998; that he owned and mis-managed a large number of entities; and that he was sloppy in observing tax laws and obligations for his companies. These facts were not in any material dispute and were amply supported by other testimony and exhibits received at trial. Nevertheless, the Government accounted for the vast majority of the information requested in Mr. Crabbe's last-minute trial subpoena. To the

---

[14]The existence of Ms. Korb's 1998 collection file was not revealed until the time of Ms. Korb's testimony at trial, at which point the Government requested that the I.R.S. undertake a search for that file. Mr. Crabbe's trial subpoenas for the tax returns of Mr. Rowan's other entities were served on the Government on February 11 and 15, 2008, the Monday and the Friday of the week preceding commencement of trial.

extent that requested material existed, but was not provided by the Government, the Court finds that the information was cumulative, and was no substantial additional value.

Accordingly, the Court finds that Mr. Crabbe was not prevented from putting on a complete defense by any of these issues, individually or cumulatively, and thus, no new trial is necessary.

## **CONCLUSION**

For the foregoing reasons, Mr. Crabbe's Motion for Judgment of Acquittal **(# 208)** and Motion for New Trial **(# 231)** are **DENIED**.

Dated this 17th day of June, 2008

**BY THE COURT:**

Marcia S. Krieger
United States District Judge